If the plaintiff had submitted before the trial to the operations which the physicians advised, and one characterized as the treatment "necessary" and "required," and the other as "proper," to relieve her pain, and the jury believed that a reasonably prudent person would have submitted to the operation, the plaintiff could have recovered therefor; and it appearing that without such operations the pain would continue indefinitely, and such operations are common, and usually successful,—we think the evidence was competent. Blate v. Railroad Co., 44 App. Div. 163, 60 N. Y. Supp. 732; Cumming v. Railroad Co., 38 Hun, 362; Alberti v. Railroad Co., 118 N. Y. 77, 23 N. E. 35, 6 L. R. A. 765; Feeney v. Railroad Co., 116 N. Y. 375, 382, 22 N. E. 402, 5 L. R. A. 544; Griswold v. Railroad Co., 115 N. Y. 61, 21 N. E. 726, 12 Am. St. Rep. 775; Strohm v. Railroad Co., 96 N. Y. 305; Filer v. Railroad Co., 49 N. Y. 42. Furthermore, the jury having been explicitly instructed—more favorably to appellants than the circumstances warranted—that plaintiff was not entitled to recover for any future pain or suffering, and the charge having confined the award for pain and suffering to the period preceding the trial, it does not appear that appellants were prejudiced by this evidence.

We have examined the other exceptions, but they do not require extended consideration. The appellants also press their motion for a new trial on the ground that the damages awarded are excessive. Plaintiff was a married woman, 29 years of age; and according to her evidence, which was supported by the testimony of the physicians, and accepted as truthful by the jury, she suffered much pain during the period of nearly two years and a half from the date of the accident to the time of the trial. We would not be justified in granting a new trial or reducing the verdict upon this ground.

These views lead to the conclusion that the judgment and order should be affirmed, with costs, as against the street railroad company, and reversed, and a new trial granted, as to the contractors, with costs to them to abide the event. All concur.

---

(68 App. Div. 488.)

CITY OF BUFFALO v. DELAWARE, L. & W. R. CO.

(Supreme Court, Appellate Division, Fourth Department. January 7, 1902.)

1. EASEMENT—ACQUIREMENT BY PRESCRIPTION—SUFFICIENCY OF USE.

Where municipal authorities regulated to some extent the repair of certain docks, but private persons owning them continuously used them for private purposes in such a way as to almost wholly interrupt any public right of way, the municipal regulations and a limited public use were not a sufficient claim of ownership or right of user to ripen into an easement by prescription.

2. DEDICATION—ACTS CONSTITUTING—ACQUIESCENCE.

Acquiescence by the owners in the municipal regulations did not constitute a dedication.

3. SAME—REVOCATION.

Where land is dedicated to a municipality for use as a street, a subsequent transfer of the same land by deed to a private party before acceptance of the dedication is a revocation thereof.

**4. SAME—ADVERSE USER—EFFECT.**

Where land alleged to have been dedicated to a municipality for use
as a street was occupied for 60 years by private persons under claim of
ownership, and in such manner as to almost entirely prevent public use,
the municipality was not thereafter entitled to assert a claim to the
land as a street.

**5. HIGHWAYS—NONUSER—EFFECT.**

Under Laws 1890, c. 568, § 99, providing that all highways that have
ceased to be traveled or used as highways for six years shall cease to
be such, a municipality is not entitled to an injunction restraining the
use of an alleged street for private purposes, preventing public travel,
where such use had been continued more than six years prior to the
bringing of the action.

Appeal from special term, Erie county.

Action by the city of Buffalo against the Delaware, Lackawanna
& Western Railroad Company. From a judgment restraining de-
fendant from occupying certain realty adversely to the public, and
denying plaintiff's application for an injunction restraining such ac-
tion as to other lands, both parties appeal. Affirmed in part and
reversed in part. See 39 N. Y. Supp. 4.

This action was commenced June 6, 1893, by the city of Buffalo, to obtain
a judgment declaring what is known as "Front Street" in that city a public
highway, and one of the streets of the city, and the piers and wharves pub-
lic piers and wharves, and to restrain the defendant from obstructing or
using the same in hostility to the rights of the public therein. The so-called
"Front Street" crosses Main street, which is the principal street of the city,
extending along the northerly bank of the Buffalo river, which is a navi-
gable stream, and over which much lake traffic is transported. The defend-
ant's lessor claims to be the owner of 700 feet of this disputed territory west
of Main street, and 390 feet easterly of the easterly line of Main street. It
has constructed docks along the entire length, and for many years the de-
fendant has been in the actual use and occupancy thereof in connection with
its railroad system. The trial court decided that the unimpeded title and
ownership of the strip of land westerly of Main street were in the defend-
ant's lessor, while easterly of Main street a street existed, and judgment
was entered accordingly. Each party appealed from that portion of the
judgment which was adverse to its contention.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WIL-
LIAMS, and HISCOCK, JJ.

W. H. Cuddeback, Corp. Counsel, for plaintiff.

John G. Milburn, for defendant.

SPRING, J. The land in dispute at an early date was owned by
the Holland Land Company. The map received in evidence of that
company pertaining to this territory shows the present Main street,
which was designated thereon as Willinks avenue. It also shows an
unnamed street, extending easterly from Willinks avenue, abutting
on Buffalo creek, which stream is called in the testimony, inter-
changeably, "Big Buffalo Creek" or "Buffalo River." There is no
street appearing on this map westerly of Willinks avenue and north
of the river until Little Buffalo creek is reached, which is a tributary
of the river. The lot on the easterly of Willinks avenue, and of
which the disputed strip forms a part, is No. 78, while on the other
side of the avenue it is designated as lot 84, and that lot extends to
the Little Buffalo creek. From that creek Water street appears on

the map extending along the front of the river to its mouth, and also northeasterly, abutting on Little Buffalo creek.  This map obviously is the one to which reference is made in the deeds from the Holland Land Company.  There was also produced a map made by Tobias Witmer, which is made evidence by an act of the legislature (chapter 221, Laws 1850).  This map purports to be a part of an atlas of the city of Buffalo transcribed from the original deed book or records of the Holland Land Company.  This map also outlines a street, designating it as Water street, one chain in width, extending along easterly from Willinks avenue, and abutting on the river.  No street is shown on this map as a continuation of water street on the westerly side of the avenue.  The town of Buffalo was created in 1810, and by chapter 35, Rev. Laws 1813, authority was given to choose three commissioners of highway of the town, and by chapter 33 of the Revised Laws of that year these commissioners were empowered to enter of record in the town clerk's office the roads of the town.  Pursuant to this statute, a map was made and filed in the town clerk's office following the Holland Land Company's map referred to, and delineating the street easterly of Main street or Willinks avenue, but none on the westerly side of Main.  In 1826, and after the village of Buffalo had been incorporated, the trustees of the village passed a resolution changing the name of the street easterly of Main street, and abutting on the river, to Front street, and narrowing it to two rods in width.  Along from 1842 to 1849 a surveyor named Lovejoy prepared a subdivision map of several of the wards of the city of Buffalo, and by resolution of the common council, passed in February, 1849, one of its committees was authorized to purchase this map, "to be a sample for the remaining wards," and this map was, in accordance with this resolution, filed as one of the maps of the city, and subsequently used as a guide in making assessments.  This map shows Front street extending along the northerly banks of the Buffalo river and each side of Main street, and embracing all the lands which are the subject of controversy in this action.  By resolution of the board of trustees of the village before the incorporation of the city, as well as subsequently, there has been some reference to and recognition of Front street as extending westerly of Main and fronting on the river.  There are also other maps which were received in evidence portraying Front street as a street extending both sides of Main, and including the disputed territory.  These maps were made and filed from 1840 to 1856, and were used and recognized to a greater or less degree by the city authorities.  There also appear in the record copies of many maps which are denominated "assessment maps," commencing back in 1842, extending through that and the succeeding decade, which show Front street delineated on both sides of Main street, and which were of service to the assessors in spreading the expenses for local improvements throughout the respective taxing districts benefited thereby.  There is no claim that Front street or any other covering the land in dispute was ever laid out as a public street or highway.  The contention of the plaintiff is that as to that portion of Front street lying east of Main street the making and filing of the map was a dedication of the easement to the

public, and the maps referred to and the action of the municipal authorities indicate an acceptance of this dedication on the part of the town, village, and later of the city of Buffalo; as the village from its incorporation accepted the streets as they existed in the town, and the city also succeeded to the like rights and assumed the burdens of its municipal predecessor. There are other resolutions and public proceedings on behalf of the public authorities, both of the village and of the city, which are referred to by the plaintiff as evincing a claim of ownership for street purposes to this property by the municipality. These extended down to 1853. It seems that early in the history of this property docks were constructed by the abutting owners, covering the alleged streets, and these were, from the earliest period of which we have any knowledge, maintained and used by these owners, ignoring apparently any public right. The municipal authorities assumed to exercise control and dominion over these docks to the extent of regulating somewhat their construction, but more particularly requiring that they be kept in repair, but always at the expense of the abutting owners.

By deed dated July 21, 1807, the Holland Land Company conveyed to Vincent Grant lot No. 78, which is easterly of Main street, and north of the river. In 1815 Grant conveyed by warranty deed to Grosvenor, describing the premises by metes and bounds, with its southerly boundary the north bounds of Water street, thus excluding the street. Title to this street was conveyed in 1829 by the Holland Land Company by quitclaim deed to one John W. Clark, who was then the owner of lot 78 in the line of deeds from Grant. A quitclaim deed of this strip had been in 1825 given to Clark by the owners preceding him, accompanying a warranty deed of lot 78; that is, at this early date there may apparently have been no user of this so-called "street" by the public, but the fact a street had in some way been denoted in the deeds and on the map deterred the transfer of the title to it by warranty deeds. In 1834 Clark parted with his title by warranty deed, including Front street in the conveyance, and substantially by a separate description. The conveyances follow this description until the title to a part of it was acquired in 1868 by the Western Transportation Company, which conveyed to the defendant's lessor in 1891. In some of the conveyances prior to 1860 there is a specific transfer of the wharf or dock, and in one of the conveyances in 1841 the following appears: "Subject to a deed or highway called 'Front Street,' laid out, opened, and used as a street, lying between the buildings and said premises, and to Big Buffalo creek." In the subsequent conveyance of the same year the clause is omitted, nor does it appear again, except that in one of the conveyances to the defendant in 1891 this clause appears: "Subject to the rights of the public, if any, in what was formerly known as 'Front Street,' in front of said premises." By deed bearing date June 19, 1819, the Holland Land Company conveyed to Isaac Davis outer lot No. 84, which is the tract westerly of Main street, and includes the strip in controversy on that side of Main street. The next conveyance is by the sheriff of one acre of the Davis tract, describing it by metes and bounds, with the southerly boundary Big Buffalo creek, which is the

other name for Buffalo river. All the subsequent conveyances in the Davis line are bounded by this river, and no mention is made of any street or highway, and the defendant's lessor acquired title through mesne conveyances from Davis in 1882 and 1883.

The early maps of this part of the disputed land do not disclose any street, and there is therefore no pretense of a dedication by the Holland Land Company or by any of the early proprietors of the land. If the village or city acquired an easement which developed into a street or highway, it has been by notorious, continuous, and open user as a street, with the assent of the owners of the fee, and by recognition, also open and intentional, by the public authorities. There are many resolutions and proceedings upon which the plaintiff relies as indicating its treatment of this strip as a street, and, as they at times relate to the entire tract in controversy, we will consider them before taking up the conduct of the owners with reference to the piece extending from Main street westerly to what is now known as "Commercial Street."

The village of Buffalo was incorporated in 1813, and became a separate road district in 1826, and a city in 1832. November 30, 1827, one Joseph Cleary, a surveyor, was employed by the board of trustees to ascertain the location of Water street, and "other streets along the northerly shore of Big Buffalo creek." Cleary made a report, accompanying it with a map, which was apparently adopted December 4, 1827, and Front street, delineated thereon, was declared to be a public street. The map is in evidence, and shows Front street west of the land now in controversy. This is significant, because the dedication, if any, made by the Holland Land Company, was long anterior to this time, and if there had been an acceptance of it, and a user thereof, we should expect to find some acknowledgment of it, or some indication that this was a street, on this map or survey, instead of a formal location of Front street, terminating at its easterly boundary before the disputed strip is reached. This is further emphasized by the fact that Front street, as portrayed on this map, has been openly and confessedly used and occupied as a public street from a very early period. On the 20th of April, 1828, certain streets in this locality were laid out by resolution of the board, "in conformity to a plan annexed hereto." The plan, while it shows Water street, Lloyd street, and Prime street, all of which have been important in this litigation, does not depict any street along the northerly shore of the river in this vicinity. Within a month after the passing of this resolution, the Holland Land Company conveyed the fee of such street to Clark, who was the owner of lot 78, contiguous to the alleged street. A resolution of the trustees was passed, March 20, 1830, providing that Front street and other streets "be and are hereby laid out agreeable to the foregoing plan, hereto annexed." The plan shows Front street extending easterly along the north river front, but no continuation of it west of Main street. A series of resolutions were passed by the board of trustees, March 20, 1830, permitting the recording of certain conveyances, providing the grantees undertook to construct a road in front of their respective premises along Big Buffalo creek. These resolutions are only

significant as denoting that even then there was no highway on the ground along where Front street is now claimed to exist.

When Buffalo became a city, the common council was vested with the control of its streets and of the wharves and docks within its limits. Laws 1832, c. 179, § 31, subds. 1, 13, and section 39. By chapter 63, § 13, Laws 1838, the charter was revised, enlarging the authority of the common council by giving that body "power to cause any wharf or dock to be built, altered, repaired or rebuilt and assess the expense on the property benefited." After this, there were many resolutions passed by that body regulating the construction and reparation of these docks. It early began to assert dominion over private docks to the extent of requiring their proper maintenance and repair. Even though owned by individuals, these wharves were quasi public in character, in that they were used largely by the public, and it was eminently proper that the municipal authorities should exercise supervision over them. We accordingly find frequent resolutions relating to the regulation of these docks, which action was entirely compatible with the ownership thereof by the abutting owners, and which was intended for the better protection of the people who went upon this property. As a sample of these resolutions, one was passed December 22, 1837, directing that "all the docks and wharves on the north side of Big Buffalo creek," in this vicinity, "shall hereafter be built, constructed and repaired or altered under the direction of the common council as a public highway." The location of the front line and height of these docks is committed to the city surveyor and the street commissioner. If this resolution was in the exercise of the authority of the common council to supervise the rebuilding or repair of these docks for the public welfare, it was within its power. If, however, by formal resolution, that body attempted to appropriate the property of the individuals for a street or for the use of the public, there was no warrant for the resolution; for the common council possessed no more power than a highway commissioner to wrest property from individuals. The statute provided a way by which a street could be established. Again, on April 19, 1838, a resolution was passed by the common council directing a committee "to inquire into the propriety of having the private docks on the northerly side of Big Buffalo creek repaired," which is a recognition of individual ownership in these wharves.

There are many resolutions of the common council, extending down to 1878, although after 1854 they are not numerous, relating to the construction or repair of the wharves, the lighting of Front street, the renumbering of the buildings thereon, and other matters pertaining to the safety of the public Whenever repairs were directed to be made, the expense thereof was invariably charged to the abutting owner. These resolutions at times recognized the docks as private property, and at other times they were inconsistent with any private right. By resolution passed April 30, 1839, the street commissioner was directed "to ascertain the width of space, if any there be, between the right of each individual or company, by deed or otherwise, and the outer line established for the building of wharves on the north side of Big Buffalo creek within this city, and report to the council

as soon as practicable." Pursuant to this resolution, the street commissioner presented "a map and survey of the line of the roads on the northerly bank of the Buffalo creek between Main and Commercial streets." A resolution was thereupon passed by the common council, March 17, 1840, declaring that this space "is and the same be hereby declared a public highway, the same to be a continuation of Front street." Down to that time, so far as the map and survey is disclosed, lot 84 had extended to the river brink, and no street was outlined. The action of the common council was not a dedication of the land for a street, because the essence of a dedication is the appropriation of the land for a specific purpose by the owner. The municipal body possessed no authority to take the land from the owner without compensation and by proceedings which were defined by the statutes of the state. These resolutions and the action of the common council from time to time are of little aid in arriving at the true status of this land, unless we read them in connection with its actual user.

We will first consider the strip westerly of Main street to Commercial slip or street. As far back as the recollection of the witnesses extends, there were docks and wharves strung along these pieces of land abutting on the river, and constructed, maintained, and used by the individuals who claimed to be riparian owners. As traffic on the lake increased, the importance of the harbor and of these docks was augmented. The principal freight early in the history of Buffalo, shipped by lake and railroad at these docks, was flour, high wines, and hides. From 1850 to 1860 this business subsided, and the shipments were of grain. The strip of land then became known as "Central Wharf," and it was the chief mart of the city. The board of trade had its office in a building on this wharf, and during the season of lake navigation the business transacted was extensive, and the dock was thronged with men during the hours of business. Each wharf extended to the river brink, and each lot owner operated and maintained his own dock as exclusively as the character of the business permitted. His own craft landed at his own dock, or, if other vessels used it, that user was to unload freight consigned to him, or to take on whatever he desired to ship. The whole alleged street was taken up with the wharves, which were 25 to 30 feet in width. As the business increased, a balcony was erected, and in the second stories of the buildings opening on this balcony the commission men had their offices and the business of the board of trade was conducted. Stairs led up from the docks to the balconies, those of the board of trade being wider than the others, and the veranda used by it was also extended out beyond that occupied by the individual owners. The heavy freight unloaded from the boats was piled up on the docks, leaving only a small irregular space for people to walk along. The snubbing posts to which the boats were tied extended into the wharf from two to six feet, and with the freight and the stairways, and with the posts which supported the veranda, interfered with the use to any extent of these wharves by teams or vehicles. In fact, such user was rare. The space claimed as Front street was therefore entirely taken up with the docks, each con-

tiguous or abutting owner apparently being vested with the same title and occupancy as to his building. Farther along the wharf, Prime slip was reached, which the street, if any there was, crossed. There was no bridge for teams over this slip, and the only means of crossing at this point was a narrow foot bridge, which was not constantly kept up. The driving of carriages on the wharf was casual and intermittent, as must be obvious from the nature of the business and the manner of carrying it on. Mr. Manning, a witness on behalf of the plaintiff, in describing this use, testified:

"I have seen a horse and buggy of a man that had an office there. He would drive the horse in there, and put it in his store, or probably in the store that was unoccupied, if he had permission to do it from the owners. He would put it in there, and keep it there until he wanted to go home to dinner. But no strangers were in the habit of driving in there. It was not used as a means of thoroughfare going from any point to any point at all. The only horses that were driven in there were horses that were owned by the occupants of one of these offices, who wanted to take care of it until he wanted to take it to go away again."

Mr. Hazard, who had been prominently identified with business on that wharf from 1847, testified:

"I don't think I ever saw a dray on Central Wharf, or an omnibus, or a carriage of any kind. There might have been at the extreme point at Main street a few feet there,—perhaps 40 or 50 feet,—where vessels might discharge rolling freight, and the drays back up from Main street and take it on. But as to Central Wharf proper, in common or any part of it, the vicinity of the board of trade, which was about the center of it in distance, 50 feet below Main street, I don't think I ever saw a dray there or any kind of vehicle."

And again:

"When I first came here this property from Main street to Prime slip I knew as 'Central Wharf.' It was known in the speech of people as 'Central Wharf' altogether. I never heard Front street mentioned until within the last two or three years, when this question seems to have been agitated. Prior to that time I never had heard of Front street anywhere,—not in that location. I can't recollect where if I heard it at all. I think it was started within the last two or three years."

Freight that was shipped to merchants or people other than those occupying these docks was unloaded at the public wharves at the foot of Main or Washington street, or at some other public wharf, and the passenger traffic was also carried on at these wharves. The docks which comprise Central Wharf were used, as already stated, by the owners, and not by the public, except as incidental to the extensive business carried on upon them. The use of the so-called "street," east of Main street to Washington, differed but little from that already described relating to Central Wharf, except that it was not so extensive. East of Main it was built in with permanent docks to the river's edge, and they were occupied by the individual owners to the exclusion of any use as a "highway," in the ordinary acceptation of that term. That people traveled over these docks without let or hindrance is true. That would be so over any dock, whether public or private. The travel of the multitude along the platform of a railroad station does not impair the company's title to the lands on which the station rests or burden the dominant estate with a servi-

tude in favor of the public.  The use is necessary to the passenger traffic which the company invites.

In 1868 the Western Transportation Company acquired title to a considerable portion of this land between Main street and Washington street, which is next east of Main.  The traffic it carried on was extensive, and its occupancy of the dock was exclusive.  About 1883 the board of trade was transferred to another part of the city, and the business which for years had been so conspicuously identified with it ceased in a large measure.  Upon the concentration of ownership of this long strip in the defendant's lessor, the docks were rebuilt at great expense, and have since been used in connection with defendant's railroad transportation business.

We cannot assent to the proposition that the plaintiff has acquired an easement by prescription in this property west of Main street. For more than half a century the riparian owners have occupied this land, repairing and maintaining the wharves.  The chief value of each lot was due to its accessibility to this navigable river.  It never dawned upon these owners during all this period that the city could destroy their wharves, and prevent the use of this strip of land, except for the passage of the traveling public.  The city authorities never asserted any such right; never sought to interfere with the exclusive use to the river by each owner of the premises to the full width of his lot.  The common council did assume to regulate somewhat the repair of the docks.  This it had a lawful right to do. Langdon v. City of New York, 93 N. Y. 130; In re Union Ferry Co., 98 N. Y. 139, 156.  In the Langdon Case the court say, at page 161 :

"The dock department, under the act of 1871, had the undoubted power to regulate the use of plaintiff's' wharf.  The legislature was competent to confer such power, and did it by that act.  A wharfinger exercises a public employment, and his business is therefore to some extent, at least, subject to legislative control.  But the power to regulate does not include or imply a power to destroy."

That and the other acts of intervention by the municipality are not sufficient to found an adverse right to the exclusion of the true owner, who is in possession without interruption.  The assertion of title or interest by the city against the legal owners must have been not only open and notorious, but inconsistent with the claim of title in the owners.  If the public occupancy or maintenance of a right in the property is concurrent with that of the owner, the one asserting authority to conserve the safety of the public, and the other all the dominion and control which the character of the property admits of, no prescriptive right will ever become effective in the city.  If the owner of a store on Main street, in the city of Buffalo, has it 10 feet back from the street line, and the space is necessarily used by the public in going to and from the store, but the owner exercises dominion over it, no easement by prescription is acquired by the city, though the passage over it by the public has continued since Buffalo was a hamlet.  The city may even be liable for negligence to one injured by reason of a defect in the walk, and to prevent this may exercise a qualified control over it, requiring it to be made secure and

safe. But the right of regulation and control for the well-being of the public, and for its own protection, is a vastly different thing from the acquisition of a title or easement by prescription. The user which ripens into a title by the public signifies a surrender of his rights by the owner. There was no abandonment of title or possession by the occupants of these wharves. They held the legal title, and in reliance upon that they constructed their docks, ignoring any street use, and absorbing all the land in dispute, which it is now contended was Front street, during this entire period. The use by these owners was incompatible with the claim of the city that this was a street, and during all these years amounted to an absolute obstruction of the street use, and without any interference by the city authorities. In defining what constitutes an adverse possession which will ripen into a title or permanent easement, Washburn, in his work on Real Property, uses this language in volume 2, p. 297 (3d Ed.):

"And all the cases concur in the doctrine that the right must be exercised adversely to that of the landowner, since no length of enjoyment by his permission, and under a recognition of his right to grant or withhold it, at his pleasure, will ripen into an easement. The inference of a grant, if raised at all, is derived from a claim on the one side, and a yielding on the other, of that which can properly be created only by grant."

In Speir v. Town of Utrecht, 121 N. Y. 420, 24 N. E. 692, the court say at page 429, 121 N. Y., and page 694, 24 N. E.: "The user must be like that of highways generally. The road must not only be traveled upon, but it must be kept in repair or taken in charge and adopted by the public authorities. We think all this is implied in the words 'used as public highways.'" The early statute, defining what are highways by user, declares (Laws 1817, c. 43, § 3) "that when any roads have been used as public highways for twenty years or more the same shall be taken and deemed as public highways." The user which creates the easement must be that which the ordinary highway or street is subject to. The location of a lamp post, the passing of a resolution regulating the repair of a wharf, or the declaration by the common council that certain land is a street, does not, after the lapse of 20 years, imply a grant to the city, where the owner has uninterruptedly possessed and controlled the land, and there has been no travel over it as a highway. As has already been suggested, there was no dedication of this strip of land. In the first place, there was no formal act of the owner setting it apart for street use. Ward v. Davis, 3 Sandf. 502; City of Cohoes v. Delaware & H. Canal Co., 134 N. Y. 397, 31 N. E. 887. As is said in the case first cited, at page 513:

"It is needless to cite authorities to prove that an absolute and final dedication of lands to a public use can only be made by the owner of an absolute fee. It is a self-evident truth that he only can devote his real estate in perpetuity to the use of the public, who is competent to convey a fee by a perfect and unincumbered title to an individual."

In the second place, the conduct of the owners was averse to any claim of the public in the premises. They covered over the alleged street with their docks, constructed a permanent balcony over them, loaded the docks with freight, which impeded the progress of teams,

and the private use was the dominant and substantially the only use to which the land was subjected. The fact that coincidentally with this occupancy the public did travel along the wharf does not operate to impose a street servitude upon it. To quote from 9 Am. & Eng. Enc. Law (2d Ed.) p. 70:

"Where a road has been opened or widened by the owner of land for his own convenience, and the use continued especially for his own convenience, a dedication is not established by the fact that others have used such road along with the owner or those entitled to its use."

See, also, Speir v. Town of Utrecht, 121 N. Y. 420, 24 N. E. 692; Irwin v. Dixion, 9 How. 19, 13 L. Ed. 25.

Again, the various resolutions of the common council and the action of city officials thereunder did not amount to a dedication of this land to a street use, even though made with knowledge of the owners. They were not dispossessed. The actual occupancy, with the exercise of every act of ownership deemed essential in the extensive business carried on, remained unmolested. They were willing to accede to whatever requirement was reasonable for the preservation of the docks, as long as their access to the river and their use of the wharves were not interfered with. These acts of the municipal authorities might have been cogent and significant in support of the acceptance of the highway, but a dedication implies that the owner abandons the use of the property himself, and gives it over to the public for the purpose designed. As was said in Bridge Co. v. Bachman, 66 N. Y. 261, at page 269: "To constitute a public highway by dedication, there must not only be an absolute dedication, a setting apart and a surrender to the public use of the land by the proprietors, but there must be an acceptance and a formal opening by the proper authorities, or a user." People v. Underhill, 144 N. Y. 316, 324, 39 N. E. 333; Holdane v. Trustees, 21 N. Y. 474; Palmer v. Palmer, 150 N. Y. 139, 148, 44 N. E. 966, 55 Am. St. Rep. 653.

The trial judge distinguishes the alleged street on the easterly side of Main street from Central Wharf, on the ground that the original dedication of this part of the street on its map referred to was a dedication of the land to a street easement. Assuming this to be so, if there had been no acceptance of the street, either by formal action of the proper authorities or by user as a highway, the subsequent grant to Clark, in 1829, was a revocation of this dedication. It seems well settled that a dedication of a street can be revoked if the dedication is before acceptance, and the rights of third parties have not become vested. 9 Am. & Eng. Enc. Law (2d Ed.) p. 78; Holdane v. Trustees, 21 N. Y. 474, 479, et seq.; Bridges v. Wyckoff, 67 N. Y. 130, 132. While ownership of the fee in the street is, of course, not inconsistent with its use by the public, yet if the street was actually opened and used we would not expect the adjacent owner to take the trouble to acquire title to it. It may be that the contemplated street was found to interfere with the building and maintenance of the docks along the river, and the original design was lost sight of in the unforeseen necessity of handling the lake traffic, as this space was early utilized for that purpose. Passing that, however, the evidence appears to us clear and positive showing that if

the street was originally dedicated and accepted for street use it has been too long abandoned for the city now to reclaim it. The use for dock purposes has continued for over 60 years, extending over the entire space between Main and Washington streets. It has during all that time not been used by the public as a highway. While the lines of Front street have been referred to in the conveyance in each instance, the description has included the street, and we apprehend these references to it will not overcome the effect of this exclusive and continuous absorption of the land by the owners of the fee with the manifest acquiescence of the municipal authorities. We are aware of the authorities, some of which are cited in the opinion of the learned trial justice before whom this action was tried, which hold that no obstruction of a public highway, however long continued, will culminate in a title by adverse holding; for instance, Driggs v. Phillips, 103 N. Y. 77, 8 N. E. 514; St. Vincent Orphan Asylum v. City of Troy, 76 N. Y. 108, 32 Am. Rep. 286. In every one of those cases there was a highway actually and openly and visibly used by the public, and the landowner was seeking to abridge its width by encroaching upon it or otherwise obstructing it. Such authorities are not applicable to a case like the present, where the owners for so long a period have occupied the alleged street for its entire width without let or disturbance, and by a user that has cut off travel upon it.

Lloyd street, which crossed Prime street, and extended to the river, was concededly a public highway. In 1888, upon the petition of the requisite number of the owners of the land facing said street, the common council formally closed, by resolution, that portion thereof between Prime street and the river. This action of that body is pertinent in support of the contention that the city was not then claiming that a street existed along the disputed territory west of Main street. If such a street existed, Lloyd street was an important thoroughfare, intersecting it, and furnishing access to it, and we would not expect its abandonment. In 1884 the Union Steamboat Company was the owner of a part of the land in dispute between Main street and Commercial street. It was conducting its business on its docks, as had been done for many years. There were piled up on them valuable merchandise and goods which it desired to protect, and it erected gates and fences across the wharves. John Martin, the street commissioner of the city of Buffalo, threatened to tear them down, and an equity action was commenced against him to restrain him from so doing. Mr. Martin defended by the city attorney, on the ground that the locus in quo was a public wharf or highway, and that the threatened abatement of these obstructions was made in his official capacity. The action was tried on the merits, resulting in a decision in favor of the steamboat company, and vindicating its title and rights of exclusive occupancy and control over the premises in controversy in the action. No appeal was taken from the judgment entered on this decision. About the same time the New York, Lake Erie & Western Railroad Company owned and occupied a wharf on the alleged street east of those now claimed by the defendant. That company also erected gates and fences upon

its docks to guard the property intrusted to it as a common carrier. The same street commissioner threatened to remove these obstructions, and a suit in equity was commenced against him and the city to restrain this intervention, and both parties defended, and the question litigated was whether this was a public wharf or highway. Again, after a trial on the merits, the trial court sustained the railroad company's right to the undisturbed possession and dominion over the property. The judgment in neither of these actions may be a bar to the present action. One did not relate to precisely the same property, and in the other the plaintiff was not in form a party. The judgments are, however, very pertinent, in that they show wherever the city has endeavored to reassert its dormant authority over this property and stimulate it into life as a street or public wharf it has signally failed in its endeavor.

While the facts seem ample to warrant the conclusion that the premises in suit are the property of the defendant or its lessors unburdened by any public right therein, there is still another barrier to the maintenance of this action. In 1868 the Western Transportation Company began acquiring the premises in dispute east of Main street. In the following years it increased its holdings until it became the owner of nearly all of this strip and the adjacent land to Washington street. It carried on a large business, rebuilding and using the docks without molestation, and it conveyed to the defendant's lessor, which also became the owner of the piece on the other side of Main street, along from 1882 to 1884. The defendant or its lessor expended a large sum in the original purchase of the property, and rebuilt the docks, and began at once after acquiring title. The work was carried on openly, and the purpose of the extensive outlay must have been obvious to the municipal authorities, and yet there was no interference nor assertion of any claim or interest in these premises. More than six years had elapsed prior to the commencement of this action without the slightest pretext of any claim on behalf of the city. Chapter 311, Laws 1861 (re-enacted in Gen. Highway Law, § 99, c. 568, Laws 1890), is as follows:

"Every public highway * * * already laid out, * * * that shall not have been opened and worked within six years from the time of its being so laid out, and every such highway hereafter to be laid out that shall not be opened and worked within the like period, shall cease to be a road for any purpose whatever; * * * and all highways that have ceased to be travelled or used as highways for six years shall cease to be a highway for any purpose."

Section 2:

"The provision of this act shall apply to every public highway and private road laid out and dedicated to the use of the public within the last six years, and to every such highway hereafter to be laid out."

In construing this statute the court say in Horey v. Village of Haverstraw, 124 N. Y. 273, 26 N. E. 532, at page 277, 124 N. Y., and page 533, 26 N. E.:

"As a road is declared not to be opened and worked, within the meaning of this statute, which is not made passable for teams within six years, so a road which for six years is not only not used and traveled, but is impassable

for any conveyances of any kind, is fenced off, and the public travel by another route, presents a situation upon which the statute must operate to destroy its legal character as a highway. And it matters not that at the beginning the road was rendered impassable and fenced off by a trespasser. Indeed, such must always be the case, unless it be done by the public authorities. The public can be protected by the highway officials whose duty it is to see to it that all public highways are kept in proper condition for public travel. They are not only charged with the duty to do so, but are provided with the legal machinery necessary to prevent trespassers from doing damage to highways, and the means necessary to restore them to a safe and passable condition for travel after the injury done. And if they neglect this duty or refuse to perform it for a period of six years, and the traveling public acquiesce, so that in all that time no one can or does make use of the highway, it ceases to be such."

See Excelsior Brick Co. v. Village of Haverstraw, 142 N. Y. 146, 150, 36 N. E. 819; Mangam v. Village of Sing Sing, 11 App. Div. 212, 42 N. Y. Supp. 950; Townsend v. Bishop, 61 App. Div. 18, 70 N. Y. Supp. 201. Inasmuch as the fee of the alleged street was never vested in the plaintiff, this statute is applicable (Woodruff v. Paddock, 56 Hun, 288, 9 N. Y. Supp. 381, affirmed 130 N. Y. 621, 29 N. E. 1021; Excelsior Brick Co. v. Village of Haverstraw, 142 N. Y. 146, 150, 36 N. E. 819; Raynor v. Syracuse University, 35 Misc. Rep. 83, 92, 71 N. Y. Supp. 293; City of Buffalo v. Hoffeld, 6 Misc. Rep. 197, 27 N. Y. Supp. 869), and is an absolute bar to the plaintiff's claim.

It needs no argument to show that these wharves could not be taken for a highway from the owners summarily. The right of access to the river is a valuable one, "and cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established laws, and if necessary that it be taken for the public good, upon due compensation." Yates v. City of Milwaukee, 10 Wall. 497, 19 L. Ed. 984. The extract quoted is cited approvingly in Rumsey v. Railroad Co., 133 N. Y. 79, 87, 30 N. E. 656, 15 L. R. A. 618, 28 Am. St. Rep. 600; also Saunders v. Railroad Co., 144 N. Y. 75, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729.

The judgment should be affirmed as to that part thereof which adjudges "that the premises in dispute, known as Central Wharf, along the north bank of Buffalo river, between Main street and Commercial street, is the property of the defendant's lessor, and is not a public street or highway, and that the wharf and docks thereon are not a public wharf or dock"; and is reversed, and a new trial ordered, with costs to the defendant (appellant) to abide the event, as to that part thereof which adjudges that the premises in controversy between Main and Washington streets, in said city, is a public street or highway, and the piers, wharves, and docks thereon public piers, wharves, and docks, and which restrains the defendant perpetually from erecting or maintaining any obstructions of any kind or description upon or within the limits of the said street, and which also adjudges that the defendant or its lessor has no right to the use of such piers and wharves "superior to the rights of any other person or the public generally" in that part of the said disputed premises. So ordered. All concur.