### TIFFANY v. TOWN OF OYSTER BAY et al.

(Supreme Court, Appellate Division, Second Department. December 30, 1910.)

1. HIGHWAYS (§ 17*)—EXISTENCE—EVIDENCE—SUFFICIENCY.
    Evidence *held* insufficient to show existence of a public highway by
    prescription along a beach, as affecting a town's right to interfere with
    an upland owner's use of adjoining land under water.
    [Ed. Note.—For other cases, see Highways, Cent. Dig. § 24; Dec. Dig.
    § 17.*]

2. HIGHWAYS (§ 7*)—ESTABLISHMENT—PRESCRIPTION.
    That from time to time people passed along a beach and dug clams
    there does not show a prescriptive highway; such use being consistent
    with a license from the landowners.
    [Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 10–18; Dec.
    Dig. § 7.*]

3. NAVIGABLE WATERS (§ 37*)—LANDS UNDER WATER—GRANT—EVIDENCE—IN-
    SUFFICIENCY.
    Evidence in a suit to enjoin interference by a town with an upland
    owner's water rights *held* insufficient to show that an ancient patent for
    the benefit of the town to lands under water covered those in question.
    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–
    227; Dec. Dig. § 37.*]

4. PUBLIC LANDS (§ 192*)—GRANTS—CONSTRUCTION.
    A claimant under a gratuitous grant from the sovereign must bring
    himself within its clear and unequivocal language; nothing being added
    thereto by implication.
    [Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 615; Dec.
    Dig. § 192.*]

5. BOUNDARIES (§ 2*)—"POINT."
    A point in a boundary is the extremity of a line.
    [Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 2; Dec. Dig.
    § 2.*
    For other definitions, see Words and Phrases, vol. 6, pp. 5419–5420.]
    Thomas and Carr, JJ., dissenting.

Appeal from Special Term, Nassau County.

Action by Louis C. Tiffany against the Town of Oyster Bay and
others. From a judgment continuing a preliminary injunction, de-
fendants appeal. Affirmed.

Argued before WOODWARD, JENKS, BURR, THOMAS, and
CARR, JJ.

Russell Benedict, for appellants.
Willard N. Baylis, for respondent.

BURR, J. Plaintiff is the owner of certain uplands, situated upon
a neck of land known as Cove Neck, which lies between two bodies
of water, one of which is known as Oyster Bay and the other as
Cold Spring Harbor, sometimes called Cold Spring Bay. Plaintiff's
lands are adjacent to the last-named waters. On the 30th of March,
1905, by letters patent dated on that day, the people of the state of
New York granted to him the land under water in front of his up-

lands. These letters patent contained a recital that they were issued to him for the following purposes:

"To erect on the land under water herein granted the following permanent structures, docks or buildings, to wit: Boathouses and bathing houses, jetties, bulkheads and other structures for the protection of the adjoining uplands and a dock or docks for access between said uplands and the waters of said Cold Spring Bay, and by filling in said lands where necessary."

Thereafter he erected and maintained a boathouse and bathhouse, certain jetties, bulkheads, and breakwaters for the protection of the adjoining uplands, and the creation of havens and harbors, and docks for access between said uplands and the said waters. Subsequently the defendant the town of Oyster Bay, acting through its officers and agents, tore down and demolished a part of these structures, and notified plaintiff that he must not attempt to restore or maintain the same or any other structure between high and low water mark in front of his uplands. Thereupon this action was brought to restrain the town and its officers from unlawful interference with his use of said lands, and from a judgment in plaintiff's favor this appeal is taken.

The town asserts its right to interfere with plaintiff's use of said land, and to compel the removal of the structures thereon, upon the ground, first, that there was a legally existing public highway along the foreshore of Cove Neck, and that plaintiff's structures constituted an interference therewith; and, second, that by virtue of a patent from Edmund Andros, Seigneur of Sausmarz, Lieutenant and Governor General under the Duke of York in 1667, the land under water and below high-water mark abutting upon plaintiff's uplands was granted to certain freeholders therein named for the benefit of the said town, and that consequently the subsequent grant to plaintiff by the people of the state in 1905 was void. The learned court at Special Term found that there was no highway over plaintiff's lands, and that the Andros patent above referred to did not describe or include any part of the premises granted by the state of New York to plaintiff.

We think that the evidence fully warrants these conclusions. If there ever was a highway along any portion of the foreshore of Cove Neck, the evidence respecting its location and boundaries is too vague and indefinite to warrant the court in holding that plaintiff's rights are affected thereby. The physical characteristics of the immediately adjoining property render it exceedingly improbable that there could have been such public highway across plaintiff's lands. It was conceded upon the trial that the town had never done any work thereon. It is quite probable that from time to time people passed back and forth along the beach when the state of the tide permitted, that they dug clams there, and crossed the same to reach the waters of the harbor for purposes of fishing. But all this user was just such as might result from license of the owners of the land, and was not of a character to establish a highway by prescription and user. City of Buffalo v. D., L. & W. R. R. Co., 68 App. Div. 488, 74 N. Y. Supp. 343, affirmed 178 N. Y. 561, 70 N. E. 1097.

The other question of fact is the more difficult one, but we are convinced, after careful consideration, that the Andros patent did not include within its metes and bounds the waters and the land under water of Cold Spring Harbor between Cove Neck and Lloyd's Neck, which is the next easterly neck of land on the northerly shore of Long Island. In construing the language of this patent, we must keep before our thought the rule that a claimant under a gratuitous grant from the sovereign must bring himself within its clear and unequivocal language, and that nothing will be added thereto by implication (Langdon v. Mayor, etc., of City of N. Y., 93 N. Y. 129, 145; Town of North Hempstead v. Eldridge, 111 App. Div. 789, 98 N. Y. Supp. 157), the fact that Cold Spring Harbor is not landlocked, but an open arm of Long Island Sound, and the further fact that in the Andros patent there are no words granting as appurtenances to the land described "bays, havens and harbors," as is the case with several of the Colonial patents, to the Long Island towns. See Robins v. Ackerly, 91 N. Y. 98; Hand v. Newton, 92 N. Y. 88; Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 22 N. E. 387. Turning, then, to the specific description in the Andros patent, we find the statement that "the east bounds whereof begin at the head of the Cold Spring." It seems to be conceded that this is at the southerly extremity of the body of water known as Cold Spring Harbor, and farthest removed from the mouth thereof. The first course given is in a southerly direction. A point is the extremity of a line. If, therefore, the east boundary begins at the head of Cold Spring and runs southerly, that fixes its northerly extremity at that point, and no part of the easterly boundary line of the land granted can extend northerly therefrom. The southerly course is declared "to range upon the southward line from the Sound or North Sea to the South Sea cross the Island."

While it may be possible to draw a line from Long Island Sound where it washes the northerly or northwesterly shore of Lloyd's Neck through the head of Cold Spring to the south side of the island (and if this were done the waters of Cold Spring Harbor would lie westerly of said line), what authority is there for such projection? Does not the grant clearly say that one terminus of the easterly boundary line is the head of Cold Spring, and that the whole of said line to the other terminus lies south of the starting point? To make the easterly boundary line run from any point on Lloyd's Neck to the South Sea would make this line lie both north and south of the starting point, which is contrary to the express language thereof. The second or westerly course in the description is along the sea coast. The remaining boundaries are thus described:

"Then Northerly to the Eastermost extent of the Great Playnes where the line divides Hempstead and Robert Williams bounds from thence stretching Westerly along the middle of the said Playnes till it bears South from the said Robert Williams markt tree at the Point of Trees called Cantiagge, thence on a North line to the said Markt Tree, and then on a North North West line Somewhat westerly to the head of Hempstead Harbour, on ye East side so to the Sound, and from thence Easterly Along the Sound to the aforemenconed North and South Line which runs across the Island by the Cold Spring aforesaid."

It is entirely clear that the waters of Hempstead Harbor are not included in this grant, since, after reaching the head of Hempstead Harbor, it proceeds along the east side thereof to the Sound. The final course and the northerly boundary line of the land granted terminates at "the aforemenconed North and South Line which runs cross the Island by the Cold Spring aforesaid." But what is the aforementioned north and south line? Is it not the line that we have pointed out, the northerly terminus of which was at the head of Cold Spring? If any other line is intended, at what point in that line is this course to terminate? Shall it be at a point on the westerly shore of Lloyd's Neck directly east of Center Island Point? Or shall it be at Lloyd's Point, or shall it be at some place on Lloyd's Neck which is in a line drawn directly north from the head of Cold Spring to the northerly boundary of the said neck, including part of the upland thereof? If either, how are we to get back to the head of Cold Spring, the place of beginning? It is true that the northerly boundary line runs "along the Sound." If we construe that as starting from Matinicock Point on the east of Hempstead Harbor, and follow the shore to the various points designated as Peacock Point, Fox Point, Oak Neck Point, Center Island Point, and Cooper's Bluff, it is not, strictly speaking, an easterly line. Following the shore, it is easterly, northeasterly, southeasterly, again northeasterly, and finally southeasterly, to the head of Cold Spring. But its general tendency is toward the east, and the construction which would include Cold Spring Harbor within the metes and bounds of the grant would not only be subject to the same criticism, but to the additional one that when it finally reached the westerly shore of Lloyd's Neck or some point easterly therefrom, and directly north from the place of beginning, it would be necessary to turn at right angles and run south, or almost directly south, to reach the fixed northerly terminus of the eastern boundary at the head of Cold Spring. It would seem improbable that it could have been the intention in the Andros patent to confer ownership of the land under the waters of this bay upon one town, whose uplands lay wholly to the west thereof, to the exclusion of another town whose uplands lay wholly to the east thereof, but abutting upon the same. Still less would it be reasonable to suppose that it was intended to include therein any portion of the upland lying east of said waters. We think, therefore, that the learned court at Special Term correctly decided that the premises in question were not included within the boundaries of the Andros patent, and, if this is so, then the town has no authority to interfere with the plaintiff; and the judgment enjoining it from so doing should be affirmed, with costs.

WOODWARD and JENKS, JJ., concur.

THOMAS, J. (dissenting). The general description given in the Andros patent bounds the land "on the North by the Sound, on the East by Huntington Limmitts on the South part by the Sea and part by Hempstead Limmitts, and on the west by the Bounds of Hempstead aforesaid," and the patent includes "all the Necks of Land and

Islands within the aforesd described bounds and Limmitts." An examination of the map at once shows that these boundaries include Cold Spring Harbor and the land in dispute. The above description follows, as if explanatory, a preceding description, which the plaintiff would unnecessarily construe in direct violation of the second description. The plaintiff's construction has three results: First, it deflects the northerly boundary from a directed easterly line so that it will run southeasterly, and probably south southeasterly, along the whole westerly side of Cold Spring Harbor, and, on such course, finally reach the technical point of beginning; second, it takes away from the easterly boundary, given in the general description, so much thereof that the portion of the town that lies northerly of the head of Cold Spring Harbor will be deprived of the easterly boundary so plainly given it, and have no boundary whatever derived from the general description; and, third, the plan or lay-out adopted for descriptive purposes in the grant is disregarded. The grantor conceived that on the easterly side of the land granted was a "Southward line from the Sound' or North Sea to the South Sea cross the Island" that corresponded in location and direction with the west line of Huntington limits. In that line is the place of starting and ending; it being described at the latter point as the "aforemenconed North and South Line which runs cross the Island by the Cold Spring aforesaid." These bounds, as given in the first description, begin "at the head of the Cold Spring and so to range upon the Southward line"; that is, this line crossing the island. A southward line is one that runs nearer to the south than to the east or west. "So to range upon the Southward line" means that the east bounds begin in it, and, as they proceed southward, correspond with it. From such place of beginning the easterly line does follow this range line to the South Sea, and such bounds are thus far a part of the Huntington west limits, running southward, not southeasterly or south southeasterly, as the plaintiff would have it in his final northerly boundary. No difficulty arises about the southerly or westerly line. But it should be observed that the westerly boundary runs "on a North North West line Somewhat Westerly to the head of Hempstead Harbour, on ye East side so to the Sound." Therefore the grant does not regard Hempstead Harbor as a part of Long Island Sound or the North Sea, and the westerly line is carried northerly to compass the land granted abutting on the open waters or Sound proper, as distinguished from any inlets therefrom. The description has now reached a place at the northwesterly point of the land granted, which, for mere convenience of reference to the map, may be called Matinicock Point, from which it is undertaken to lay down the north boundary of the town, as to which the language is:

"From thence Easterly Along the Sound to the aforemenconed North and South Line which runs cross the Island by the Cold Spring aforesaid."

There are three requisites of that northerly boundary: (1) That it shall run easterly; (2) that it shall run along the Sound; and (3) that it shall run to the range line—that is, to the "aforemenconed North and South Line which runs cross the Island by the Cold Spring

aforesaid." The line which this easterly line shall meet runs "by" —that is, through—"Cold Spring aforesaid." This range must have one end in the North Sea and one end in the South Sea. But the plaintiff insists that the head of Cold Spring Harbor is the northerly beginning of the North Sea, and that, if the range line ends there, the demands of the description are satisfied. This seems to beg the question in dispute. But, as already stated, the range line goes "by" the point of beginning. The range line does not start at that point. The "east bounds" are to begin so as to range in the line across the island. But in any case the plaintiff, to sustain his contention, must in some way get to his place of beginning. How does he do it? He starts his northerly line, as indicated, perchance at Matinicock Point, runs it easterly to the northwest corner of the mouth of Cold Spring Harbor, which, for convenience of reference, I will call Center Island Point, then turns it southeasterly or south southeasterly, following snugly the shore line on the westerly side of Cold Spring Harbor to the place of beginning. By the time this northerly line, ordered to go easterly, reaches its place of beginning, it has from Center Island Point wandered from its permitted direction into the strange and unwarranted misshape of a southeasterly or more southerly line. The justification for this I understand to be that, as the easterly line from Matinicock Point must follow the sinuosities "Along the Sound," it has from time to time varied from easterly to northeasterly and southeasterly, and that it is no greater errancy to turn it at Center Island Point and let it go down the whole of the west side of Cold Spring Harbor in whatever direction it is thereby taken. Although it be necessary that this northerly line shall follow the changing directions of the north shore, still its trend must be easterly, and so, while running easterly, it must meet the range line across the island. The northern seashore has a series of windings, but from Matinicock Point to Center Island Point it has a general bearing to the eastward, and not to the northeast or to the southeast, and, for the reason that some of the curves of the north shore depart more or less in their directions from an easterly course, it is not excusable to change the directed easterly course of the north boundary line, and at Center Island Point bend it into another permanent direction, and cause it to become southeasterly or south southeasterly, inasmuch as it was directed to join the range line upon an easterly course. It cannot be claimed that this easterly line would be equally disturbed in its course, if carried to meet the range line running southwardly from sea to sea. Upon reaching Center Island Point, it would be carried easterly to the western limits of Huntington. Although this might not be a direct east line, it was not required to be such. It is sufficient that it is more easterly than southeasterly. It was not necessary that it should run so as to include Lloyd's Neck. Indeed, the respondent states in his brief that the "appellants chiefly base their construction upon the erroneous assumption that Lloyd's Neck (formerly Horse Neck, or Manor of Queens), which lies northerly from Huntington, was included as a part of the land granted to Oyster Bay in 1677," and thereupon quotes from certain patents to the town of Huntington, one of which shows that

Lloyd's Neck was, as early as 1666, 11 years before the patent in question, granted to the town of Huntington. These patents, brought to the attention of the court to sustain the judgment, limit Huntington, in 1666, on the west by Cold Spring, etc., and on the north "by the Sound running betwixt Long Island and the Maine," or, as stated in the Fletcher patent in 1694, Huntington is bounded "on the west by a river called and known by the name Cold Spring a line running south from the head of the said Cold Spring to the South Sea, and on the North by the Sound that runs between our said Island of Nassau and the main continent." Plaintiff also makes reference to a grant of Manor of Queens village in 1667 by Governor Nicolls, ratified by Governor Dongan in 1685, which bounds Lloyd's Neck on the west "with Oysterbay." If these patents (not in evidence) may be used to affirm the judgment, they show that Lloyd's Neck in 1667, at the time of the Andros patent, was not conveyed to Oyster Bay. But it should now be considered that by the plaintiff's construction of the Andros patent the integrity of the east line of the boundary given in the general description is destroyed. Nothing is left of it above the head of Cold Spring Harbor. If Cold Spring Harbor is not included in the Andros patent, the general easterly boundary should be Huntington Limits and Cold Spring Harbor, but it is not so in the patent, for Huntington limits comprise the whole of the easterly bound. Now, the plaintiff would lift this east boundary from the seat side of Cold Spring Harbor and the West Huntington limits, and boldly set it down on the west side of the harbor. So no general boundary is left to the grantee except southward of the head of Cold Spring Harbor. It seems somewhat extravagant to tear off a part of the boundary in a general description by turning the northerly boundary and easterly line into a southeasterly line. In other words, by contorting the northerly boundary running easterly, the plaintiff would also change the easterly boundary from the east to the west side of the harbor, and by such shunting of a well-described line exclude the harbor, and leave the easterly boundary as given in the general description a mere fragment. The defect of the construction I have adopted is that it is necessary in the first description to extend the first line from the place of beginning so as to meet the last northerly boundary as it proceeds easterly. But the patent says that the northerly boundary shall proceed "Easterly Along the Sound to the aforemenconed North and South Line which runs cross the Island by the Cold Spring aforesaid." So the northerly line must intersect the range line, and it is a just inference that it was intended to extend the east boundary so far northerly as to permit an intersection of the northerly line running in an easterly direction. Otherwise they could not meet. By doing this the first description exactly agrees with the second description. By plaintiff's construction he not only extends a line and makes it run in the wrong direction, but shatters the general boundary line, uses what he wishes, and disregards the rest. Finally, if it were the intention to carry the northerly line, directed to go easterly, to the place of beginning, to wit, the head of Cold Spring, why was that not said in the usual language, rather than by a direction that such northerly line should

run easterly to meet the line running from sea to sea across the island and by the head of Cold Spring.

While I concur in the conclusion respecting the highway, it is considered that, for the reasons above given, the disputed land falls within the Andros patent, and that the judgment should be reversed.

CARR, JJ., concurs.