BYWATER *et al. v.* A RAFT OF PILES.

*(District Court, D. Washington.* June 17, 1890.)

1. SALVAGE—SUBJECT—RAFT ADRIFT.
    A raft of timber found drifting with the tide on deep water in a harbor, and out of the control of the owners, is a subject of salvage.
2. SAME—WHO ARE SALVORS—ACTIONS.
    Persons finding a raft so situated, who secure it for the owners, render a valuable service, for which a claim of salvage is enforceable in admiralty.

*(Syllabus by the Court.)*

In Admiralty.

*R. S. Greene* and *L. T. Turner,* for libelants.

*J. C. Haines,* for claimants.

HANFORD, J. The libelants in this cause claim compensation for salvage services rendered in arresting, towing to a place of safety, and securing a raft of piles found adrift and derelict in Seattle harbor. The claimants, who are owners of the piles, deny that the property is a subject of salvage under maritime law; deny that it was in peril at the time of being taken in charge of by the libelants; and deny that the facts make a case within the jurisdiction of a court of admiralty. The material facts of the case are that the raft in question had been moored by its owners, the claimants in this case, at a wharf owned by them situated in the southern part of Seattle bay. That on the morning of a pleasant day in June, in some manner, it got loose and went adrift, and between 8 and 9 o'clock in the morning was discovered by one of the libelants about one mile north of the wharf to which it had been moored, and something over one mile from the eastern shore of the bay, drifting on an ebb-tide towards the harbor entrance. There was at the time a light breeze from the south-west, and the water was smooth. The libelant Elliott was owner of a small steam-tug called the Violet, and the other libelants were at the time connected with this vessel as master, engineer, and deck-hand, constituting her entire crew, and the tug was then employed as a general jobbing boat, doing towing and like service on Seattle bay and the neighboring waters, and earning on an average $25 to $30 per day; the usual rates for services such as this boat had capacity to render, when employed by the hour, being $2.50 per hour. When the libelants discovered the raft, the tug was in her berth at the wharf, with steam up, and ready to accept any offer of employment that might be made to her, and they immediately went to the raft, and brought it in, and secured it to a wharf opposite to which it had drifted on the eastern shore of the bay; in doing which, between two and three hours' time was consumed. The raft was quite valuable, worth at least $2,200, and was at the time of being so taken charge of by the libelants out of the control of its owners, and in apparent imminent danger of being lost, although the real danger was but slight, and in rescuing it the libelants incurred no danger to themselves, and suffered no hardships, more than

is incident to their usual and every-day employment. In towing the raft and mooring it the libelants used lines provided by themselves from the tug of the value of $13, which have not been returned to them. One of the claimants discovered the departure of the raft very soon after the libelants had found it, and he immediately started in pursuit of it, and appeared and claimed it as soon as the libelants had moored it, and requested the libelants to tow it back to the place from whence it had drifted, which they were unable to do, the tug not having power enough to move so heavy a raft against the current. In the evening of the same day a tug of greater power employed by the claimants towed the raft back to their wharf.

It is indisputable that the libelants did render a service of some value to the claimants in arresting and holding this raft, and a service of such a nature that public policy commends it, and dictates that a suitable reward be granted for it, although the reward should not be such as to impose any considerable burden upon the claimants. The service was voluntary on the part of the libelants, and at the outset they undertook to do and undergo whatever might be necessary in order to save valuable property for whatever reward or compensation a court of conscience might see fit to allow, be it much or little. The service so rendered comes fairly within the definition of a salvage service. Upon the argument it was denied that the case is one of salvage, and authorities were cited by counsel on both sides, and from the language of the several opinions there appears to be a conflict between them on this point. But the facts in the different cases were so different as to afford abundant ground to distinguish between them; and most of them are maintainable on true principles, and harmoniously with the decisions by Judge BETTS in *A Raft of Spars*, 1 Abb. Adm. 485, and by Judge LOWELL in *Fifty Thousand Feet of Timber*, 2 Low. 64, and by Judge PARDEE in *Muntz v. A Raft of Timber*, 15 Fed. Rep. 555, 557. These three cases are the nearest in point of any that have been cited, and were well considered, and decided in the light of all preceding rulings bearing upon the question, and I feel safe in following them.

The case decided by Judge TANEY, (*Tome v. Four Cribs of Lumber*, reported in Taney's Decisions, on page 533,) was one in which salvage was claimed for arresting lumber rafts floating down the Susquehanna river. The lumber had been made up into cribs and rafts, designed expressly to be in that form transported to market by being floated down the river; and it was the constant practice of lumber-men to use the river for floating similar rafts; and Judge TANEY, as I think, very properly held that it was the right of owners of such property to subject it to such risks as might be incident to that mode of transportation, and that it would be a hardship upon them to permit unauthorized persons to deprive the owners of possession of valuable property, and subject them to liability for salvage by interfering with such rafts when found afloat on the stream. I certainly think that justice would require me to hold that an unauthorized interference with logs or lumber while floating down any of the rivers of this state, according to the customary mode of transport-

ing such property, would render the person interfering liable for damages as a trespasser, rather than entitled to a reward as a salvor. But in case of a large raft adrift in deep water, and not confined to any particular channel, nor certain to follow any fixed course, and especially in the harbor of a busy commercial city, a different rule is necessary; any person who finds such a raft so situated, and secures it for the owner, renders a valuable service to him, and to all persons interested in keeping the harbor clear of obstructions.

I deem it unnecessary to review or comment on the other cases cited by counsel for the claimant. It is enough to say that they are not in point, and, if they were, they are not of such binding authority as to require me to disregard the better reasons favoring the opposite conclusion.

As to the amount to be awarded, I consider the case similar to the one decided by Judge BETTS, as regards the merits of the services. In that case the property, a raft of spars, was of much less value than the property in this case, but it was in greater peril. The labor performed in towing it to a place of security was about the same as in this case, but the salvors had to watch and protect the spars for several days thereafter. No such service was necessary in this case. In that case Judge BETTS awarded $50. In this case, in consideration of the ropes used and lost in the service, and all the facts, I award to the libelant Frank Elliott, owner of said tug, $30, and to each of the other libelants $5; making a total of $45.