**COLBY et al. v. TODD PACKING CO.**

No. 5885.

United States District Court, Alaska
First Division, Juneau.

Nov. 5, 1948.

Joseph A. McLean, of Juneau, Alaska, for libellants.

R. E. Robertson, of Juneau, Alaska, for respondent.

FOLTA, District Judge.

In this suit the libellants seek to recover $5,000 for services alleged to have been rendered in connection with saving five fish trap frames from possible damage or destruction from a marine peril. On their behalf it was testified substantially as follows.

On March 28, 1948, from their logging camp, they discovered two rafts, one containing two and the other three fish trap frames, adrift in Peril Straits. Their efforts to tow the larger raft into Rodman Bay failed, after the wind changed, because of a lack of power. In the afternoon of the following day libellants Riggle and Lane discovered the same raft about 200—300 feet off the northern end of Hanus Island at the entrance to Hanus Bay. They fastened a three-eighths-inch cable, three-hundred-feet long, to the nearest trap and snubbed the other end around a hemlock tree ashore and, as the tide or wind or both set the traps toward the shore, they took up the slack until one end of this raft of trap frames was resting on the shore near the high-tide line. On the next high tide at about 5:10 a. m. which was 2 feet higher, the raft drifted or was pulled correspondingly higher on the shore.

The over-all dimensions of each trap were approximately 160 by 175 feet, and the end and side logs were approximately 5 feet in diameter at the butt end. Although the other logs and timbers in the frame were less massive, the weight and draft of the entire raft, which included extra logs for replacement, were such as to warrant the conclusion that two men, at the end of a three-hundred-foot cable placed around a hemlock tree, could not, unassisted by wind or tide, have pulled the raft as¹ re.

It, therefore, is important to determine just what libellants' services consisted of in the light of the attendant circumstances. Manifestly, this can hardly be done without proof as to what the wind and tidal current were at the time, particularly in view of the testimony that a strong wind would influence the drift of such a structure more than the tide or, in other words, would overcome the effect of the tide. While it seems doubtful that any wind less than one of gale proportions could overcome the effect of a spring tide on the flood or ebb, the testimony as it stands is that the wind, such as it was, was sufficient to do just this. Unfortunately, it is difficult, if not impossible, to reconcile the testimony of libellants in regard to the wind and tide during the time that they testified they were engaged in pulling the raft to the shore. They first testified that the wind "blew westerly", but from all the evidence it appears that they meant that it was a westerly wind and not one blowing westerly. On cross examination they testified or admitted that it blew from the northeast and finally that, as the raft rested on the beach with the traps lying, so far as their length is concerned, practically parallel with the beach, the wind blew across the traps toward the shore of Hanus Island. Since the libellants placed the raft on the easterly shore of Hanus Island, this testimony that the wind was blowing across the traps would be consistent with the testimony that it blew from the northeast. But after respondent introduced United States Coast and Geodetic Survey Chart No. 8283 into evidence as its Exhibit A and proved that the traps lay on the westerly shore of the northern tip of Hanus Island, libellants admitted that that was the correct position of the traps, from which it follows that, if the testimony that the wind blew across the traps is to be given credence, it must have been blowing from a westerly direction. I am inclined to so interpret it since it is obvious that libellants, in making their sketch of Hanus Island and surrounding waters, were confused as to compass directions. Likewise, the testimony of the libellants as to the direction of the tidal current at that time is difficult to reconcile. They testified that at the time they discovered the traps off Hanus Island the tide was flowing toward Chatham Straits. But since the official tide tables of the United States Coast and Geodetic Survey, of which the Court takes judicial notice, show that it was a flood tide until 5:20 p. m. on March 29, 1948, and it is undisputed that a flood tide flows from Chatham Straits westerly into Peril Straits, of which Hanus Bay is but a shallow indentation, it is clear that libellants were in error as to the direction of the tidal current. Although the foregoing analysis of the testimony is in accord with libellants testimony that at the time the raft was discovered it was drifting in such a direction as to take it by the northern end of Hanus Island and in the direction of a rocky islet or two to the eastward thereof, it is not clear how the raft was brought ashore on the westerly side of the northern tip of the island unless, contrary to the testimony, the tidal current influenced the drift of the raft far more than the wind and was taking it to the west of Hanus Island when it was warped in to the shore. However, libellants did not claim that they warped the raft into that position. They testified that they merely took up the slack as the trap approached the shore and then made the raft fast to a boulder.

Thereafter the tides began to neap and did not again reach the height of 15.8 feet until eight days later. It would, therefore, seem that the trap nearest to the high-tide line could not have drifted off. But since the remaining traps were lashed to it and were afloat at every intervening tide, the lashings could have loosened or parted under the impact of heavy seas or wind and set one or more of the traps adrift. Unlike a vessel, however, a fish trap frame would sustain little or no damage from drifting ashore in inland waters. Indeed such frames are customarily moored to the shore in some sheltered bay or cove between fishing seasons. Nevertheless, there is some danger that when adrift a structure of this kind may be taken into more open water or may pile up on a rocky shore where in heavy seas it may be damaged considerably or destroyed. Irrespective of the fact that

it was **not** contradicted that the shores of Peril Straits immediately to the west, south and east of Hanus Island were generally sandy and clear of obstruction so that, if the raft had cleared Hanus Island and the rocky islets referred to, it would have lodged upon a beach where it would have been safe, nevertheless, the Court is of the opinion that, if the libellants secured the traps to the shore of Hanus Island and thereafter maintained and renewed the lines and lashings from time to time and thus saved the traps, or any of them, from again going adrift and possibly lodging in a less favorable place, it would appear to be a salvage service, albeit of a low order.

In these operations libellants Riggle and Lane used their dory and a sixteen horse-power motor aggregating $650 in value, and tools and cable of the value of $150 belonging to the libellants Oliver and Lowell Colby, who as copartners operated the logging camp. Neither of the Colby brothers appeared or testified orally or otherwise. The most the Court can find from the evidence is that they fastened the second raft of traps to the northern shore of Peril Straits on March 30th after they found or learned that it had lodged there. The question presented in this connection is whether that act alone constitutes a salvage service. In view of the evidence that both traps lay parallel to the high-tide line with one end of each so far ashore as to make it impossible for them to float off during the neap tides and before they were removed by respondent on April 2nd, and in the absence of any evidence that they were saved from any danger greater than they were in, I am of the opinion that the act of securing them to the shore was, standing alone, not such as to constitute a salvage service. Raft of Spars, 20 Fed. Cas. page 173, No. 11,529; Bywater v. Raft of Piles, D.C., 42 F. 917.

Respondent's exceptions to the libel, on the ground that fish trap frames are not a subject of salvage, were overruled. D.C., 77 F.Supp. 956. Obviously respondent was in no position to directly contradict the testimony of the libellants. However, some testimony was adduced from which it might be inferred that libellants had an exaggerated idea of the law of salvage so far as compensation is concerned and also that when they discovered the trap frames they were already resting on the shore of Hanus Island and that the weather was not as bad as they testified, but the Court finds that the libellants have sustained the burden of proof so far as the Hanus Island operations are concerned and accordingly awards the libellants Riggle and Lane $350 each and the Colby brothers $50 for the use of their cable and tools, with costs. The efforts made by the libellants to save the first raft on March 28th, although highly commendable, cannot furnish the basis for any award because the efforts failed and, hence, no benefit was conferred upon the respondent.