Charles c. MacLean, Jr., P. J.
The defendants herein are charged in sworn informations with having violated section 1 of Ordinance 12 of the Incorporated Village of Lloyd Harbor by willfully trespassing upon property, located within the village, owned by Sherman M. Fairchild or under lease to him from the Field Foundation, Inc.
*375 Ordinance No. 12, entitled “No Trespassing” provides:
“ Section 1. No person shall intrude upon any lot or piece of land within the boundaries of the Village of Lloyd Harbor, without authority from the owner thereof, and no person shall erect or occupy thereon any building or other structure whatever without such authority.
“ Section 2. Any person violating any of the provisions of this ordinance shall, upon conviction, be punishable by a fine of not to exceed One Hundred Dollars and, in addition thereto, such violation shall constitute and is hereby declared to be disorderly conduct, and any person violating the same shall and is hereby declared to be a disorderly person.”
Specifically, each of the defendants other than Seannella is charged with having dropped anchor from his boat, without the authority of Mr. Fairchild, upon posted land under water owned by or under lease to Mr. Fairchild and with having refused to remove the anchor after being informed of the alleged violation. The defendant Seannella is charged with willful trespass upon the beach included in the area under lease to Mr. Fairchild from the Field Foundation and also with having dropped anchor on the underwater lands. The information specifies that the alleged trespass on the beach occurred below mean high water level.
The defendants do not deny dropping anchor on the underwater lands, as charged, nor does the defendant Seannella deny intruding upon the foreshore, as charged. They base their defense solely on two grounds: (1) their claim that ownership of the land in question remains in the State of New York, and (2) the legal proposition that, regardless of the ownership of the land, the waters over the land are navigable waters and therefore subject to the public right of navigation, which includes, they say, the right to anchor and to enter on the foreshore.
The area involved is a harbor opening off Long Island Sound, located in the northwest portion of Lloyd Neck, and situated within the limits of the village of Lloyd Harbor. This harbor, which is a body of water entirely distinct from Lloyd Harbor itself, is referred to by some as “ Lloyd Point Basin ” and by others as “ Sand City ”. The most recent issue of the chart of the United States Coast and Geodetic Survey for the Oyster and Huntington Bays area (Chart 224 [3d ed.], Feb. 1, 1943, rev. May 14, 1956) indicates that the harbor measures about seven tenths of a nautical mile between its northerly and southerly ends and about three tenths of a nautical mile at its
*376 376
7 MISCELLANEOUS REPORTS, 2d SERIES
greatest width, east and west. The entrance from the sound is on the west side of the harbor and is shown by the chart to have a depth of 12 feet at mean low water. The harbor itself is shown to have a depth, at mean low water, of 18 feet near its center and about 9 feet at the northerly and southerly ends.
The harbor is bounded on the west and north by sand bars which separate it from the deep waters of the sound. On the east, the northerly half of the harbor is bounded by tidal marshlands and the southerly half by a sand beach behind which the upland raises sharply to a height of more than 100 feet above mean high water level. The harbor and surrounding area as of the present time are fairly depicted in the aerial photograph introduced in evidence as People’s Exhibit 9.
The parties to these proceedings are in agreement that the harbor is not a natural one but has been made by man in relatively recent times. This conclusion is supported by the survey introduced in evidence in connection with the question of title. The earliest of these surveys, dated 1685 (of " Horse Neck alias Queen's Village ", made for James Lloyd) shows the entire area of the present harbor and surrounding sand bars as "Meadow & Beach ". A stream running through the area to the sound is described as " a Brook 7' foot at highest a Ohaine wide ".* A survey dated 1722, entitled "A Survey of the Mannor of Queens Village ", shows the same conditions in the area except that a line of trees is indicated along the northwesterly edge of the "Meadow & Beach ", in the approximate location of the present beach areas on the north and west sides of the harbor.
A much more detailed survey made by Samuel Willis in 1764 (on file in the Suffolk County Clerk’s office) describes the area of the present harbor as “ Broken marsh, ponds, creeks, etc.”, but further shows, as the older surveys do not, that a wide strip of beach separated the tidal area from the sound at all points except the cut where the stream entered the sound. In general, the beach areas shown on the 1764 survey conform to the present beach areas on the west and north sides of the harbor.
Referring to the above-mentioned surveys and charts, the brief on behalf of the complainant states: “ The record before this Court, we submit, can lead .only to the conclusion that the Basin was man-made after it came into private ownership.”
*A chain’s length, according to usage current in 1661, equalled “66 feet or 4 poles”. (1 Shorter Oxford English Dictionary [2d ed., 1936].)
*377 This is not disputed by the defendants, who also claim, however, that the present beaches on the north and west sides of the harbor are man-made. On this point, the brief submitted on their behalf states: “ Sand and gravel operations, begun commercially in 1893 by Godfrey and Jones and continued down through the last war, have resulted in the dredging away of the marsh pond and beach shingle and the creation of a new beach to the north by deposit of the screenings. The present tidal basin is located where the original tidal marsh and pond once were.”
The United States Coast Pilot (Atlantic Coast, Section B, Cape Cod to Sandy Hook [5th ed., 1950]) contains the following description of the area (p. 344) :* “ About 0.6 mile southwestward of Lloyd Point are two small jetties between which is the entrance to a pond which has been dredged into the spit by a sand and gravel company. The jetties are covered to a depth of 2 feet at mean low water. The harbor, locally known as SAND CITY, may be entered by steering a mid-channel course between the jetties. It is used considerably by local boats as an anchorage and as a harbor of refuge. The holding ground is good.” References to the area are also contained in the 1914 (part IV) and 1933 (Section B) editions of the Coast Pilot. In the 1933 edition the statement is made (p. 244): “ Yachts run in and out of the pond, where a good anchorage is afforded in a depth of about 6 feet (1.8m).”
The testimony of the defendant Kraemer stands unchallenged that for a period of over 30 years, to his own knowledge, the harbor has been utilized continuously by pleasure boats during the boating season (early May to mid-October), particularly on weekends. He also testified that the average number of boats present in the harbor on weekends when the weather was favorable has been between 25 and 30, except during the war when gasoline restrictions kept most boats ashore. He further testified that the boats using the harbor have ranged in length up to 50 feet. The complainant testified that there were times in the summer of 1956 when well over 100 boats were present in the basin, some of them of a length of more than 40 feet.
The harbor has been shown on the United States Coast and Geodetic Survey chart of the Oyster Bay and Huntington Bays areas (Chart No. 224) since the first edition thereof, published in 1920.
*378 The use of the harbor has been almost exclusively by pleasure craft; no significant commercial operations, at least of a legitimate nature, are claimed to have been carried on therein.
During the entire 30-year period, so Mr. Kraemer testified, boats have anchored throughout the northerly portion of the harbor, the area here in question, and until last year there was no interference with the boatmen using this area by anyone claiming ownership in the land.* Complainant testified that in the summer of 1956 he issued two summonses for trespass in the area. In each of those cases, however, the complaint involved intrusion upon the beach above high-water level.
The principal question presented in these proceedings is whether the boatmen may now be prevented from using the area in their accustomed way by upland owners claiming also to own the land under the waters of the harbor.
I.
The complainant has introduced in evidence deeds and surveys which establish prima facie that Mr. Fairchild and his lessor are the owners of the lands under water in the northerly portion of the harbor (Civ. Prac. Act, § 384). The defendants apparently would not dispute that, if the lands in question are held in private ownership, they are owned by Mr. Fairchild and his lessor. The defendants assert, however, that the State of New York derived title to these lands from the British crown and that such title has never been conveyed out of the State.
Specifically, the defendants contend that the lands in question were not covered either by the Horse Neck patent granted by colonial Governor Nicolls to Nathaniel Sylvester and others in 1667, or by the confirmatory provisions contained in the Grant of the Manner of Queens Village, made by colonial Lt. Governor Dongan to James Lloyd and others in 1685, from which patent and grant all title to Lloyd Neck property appears to be derived. (See Tiffany v. Town of Oyster Bay, 209 N. Y. 1, revg. 141 App. Div. 720.)
This contention is based on (1) the fact that the colonial deeds specify Long Island Sound as the northerly limit of the lands conveyed and (2) a claim that the area involved was subject to the ebb and flow of the tide at the time of the colonial *379 deeds, and therefore was part of the sound and not part of the land conveyed.*
In view of the fact that title to the lands here in question apparently has not been challenged in a period of almost 300 years, only the most compelling evidence could lead the court to accept the defendants’ contention in this regard. No such evidence has been presented here. The contention depends for its validity upon an interpretation of the two early surveys of the Neck, made in 1685 and 1722, referred to above. They are of a sketchy nature. Although they clearly distinguish the area in question from the upland, they do not compel the inference that the entire area was below mean high-water level; indeed they refer to the area as “ Meadow & Beach.” The 1722 survey indicates the existence of trees along the northwesterly edge of the area, a circumstance not consistent with the defendants’ contention. The much more detailed survey made by Willis in 1764 makes it clear that the area of the marshlands and stream was completely separated from the sound by beaches except for the cut where the stream entered the sound. Further, this survey labels different sections of the beach as belonging to various individuals. There is, then, no basis for the claim that the beach is of more recent origin.
For these reasons the court is not persuaded that the surveys of 1685 and 1722 were correct in failing to show the tidal marshlands as separated from the sound by the beach. Accordingly, the court must reject the contention that the area in question was not conveyed by the colonial grants and hold that for all purposes of these proceedings Mr. Fairchild and his lessor are to be considered the owners of the underwater lands and foreshore here involved.
n.
The defendants’ second line of defense is based on the claim that the waters of the harbor are subject to the public right of navigation and that the acts complained of were done in the exercise of the public right. In opposition to this contention, *380 the complainant maintains that the public right of navigation does not extend to the harbor because that right exists only over waters that are “navigable” as a matter of law. He further maintains that the harbor is not navigable in that sense because (A) the harbor is not useful in commerce and (B) the harbor was created out of land held in private ownership.
(A) There can be no question that the harbor is in fact navigable, not only by private boats but by the smaller types of commercial craft, such as fishing and oyster boats. That fact is sufficient to establish that the waters of the harbor constitute part of the navigable waters of the State and of the United States. It is immaterial that, in fact, the harbor is not used to any significant extent for commercial purposes; the most that is required is that the harbor be potentially useful for such purposes. In United States v. Appalachian Power Co. (311 U. S. 377, 416), the Supreme Court said: “ Nor is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation.”
The harbor is located in a region in which there is a substantial amount of commercial traffic of a type that might utilize the harbor for purposes of navigation as, for example, to lay up overnight in the course of a journey through the sound. Further, under a trend of judicial decisions, even if there were no commercial traffic in the region, the utility of the harbor for pleasure boating would in itself be sufficient to warrant the court in holding that its waters were navigable as a matter of law. (Attorney General v. Woods, 108 Mass. 436; Silver Springs Paradise Co. v. Ray, 50 F. 2d 356, cert. denied 284 U. S. 649; Lamprey v. State, 52 Minn. 181; see, also, Coleman v. Schaeffer, 163 Ohio St. 202.)
In the earliest of these cases, Attorney General v. Woods, the Massachusetts Supreme Judicial Court said (supra, p. 440):
‘ ‘ If water is navigable for pleasure boating, it must be regarded as navigable water, though no craft has ever been upon it for the purposes of trade or agriculture. Tbe purpose of the navigation is not the subject of inquiry, but the fact of the capacity of the water for use in navigation.”
(B) The complainant’s further contention, that the public right of navigation does not extend to the harbor because it was created by man out of privately owned land, involves a consideration of the significance of two circumstances: (1) that the underwater lands in question are in private ownership, and (2) that the harbor has been created artificially by action of the landowners or their predecessors in title.
*381 (1) The public right of navigation is entirely separate and distinct from the rights of the owner of the land under the water. In the early case of People v. Vanderbilt (26 N. Y. 287, 292-293), Judge Selden, speaking for the court, said: “ The right of property in the soil or bed of a navigable river or arm of the sea, and the right to use the waters for the purposes of navigation, are entirely separate and distinct. The first of these rights * * * may be alienated by the king or people so as to become vested in an individual or corporation * * *. The second is a right common to the whole people, and it is vested in the public at large * * *. It will be seen, therefore, that there is a wide difference between the two, and that although they may coexist, yet either may exist alone without the other.” It follows that the public may have a right of navigation over waters regardless of whether ownership of the land under the waters remains in the State or has been conveyed by the State to private individuals. (See, e.g., Lewis Blue Point Oyster Cultivation Co. v. Briggs, 198 N. Y. 287, affd. 229 U. S. 82; Fulton Light, Heat & Power Co. v. State of New York, 200 N. Y. 400, 412.) (“ The navigability, in fact, of the stream had no relevancy to the question of the title to its bed; it was relevant solely to the public right to pass, or to transport, upon it”). Accordingly, the fact that the lands under the harbor are in private ownership has no special relevance to a determination of the question whether the public has a right of navigation in the harbor.
(2) Although the harbor is man-made, the record herein shows, as noted above, that a tidal stream of fair proportions flowed through the area in its natural state. Under these circumstances the case must be viewed as involving either the expansion of a navigable stream over lands held in private ownership or the expansion of the navigable waters of the sound over such lands.
The decided cases are not in agreement as to the legal consequences that result from the submersion of privately owned lands by public waters. In a few jurisdictions the courts have held that the public does not acquire a right to navigate in an artificial channel made by the owners of the underlying land. (Clement v. Watson, 63 Fla. 109; Ilhenny v. Broussard, 172 La. 895; King v. Muller, 73 N. J. Eq. 32.) However, in a majority of jurisdictions where the question has arisen the courts have held that the public right of navigation followed the public waters when, by act of God or man, they were made to submerge private land. (United States v. Pennsylvania Salt Mfg. Co., 30 F. 2d 332; Bohn v. Albertson, 107 Cal. App. 2d 738; *382 Burrus v. Edward Rutledge Timber Co., 34 Idaho 606; Schulte v. Warren, 218 Ill. 108; Diversion Lake Club v. Heath, 126 Tex. 129; Mendota Club v. Anderson, 101 Wis. 479; Village of Pewaukee v. Savoy, 103 Wis. 271; see, also, Delaney v. Boston, 2 Harr. [Del.] 489.)
The theory upon which these decisions rest is indicated by the following quotations.
In Village of Pewaukee v. Savoy (103 Wis. 271, 276-277, supra) the Supreme Court of Wisconsin said: “ When the owner of the land raised the lake level so as to cover it, such land immediately became subject to use by the public as a part of the natural lake bed, not by permission of the owner of the paper title, but by the same right that the public used any other part of the lake. The owner of the land possessed no right to exclude the public therefrom so long as the waters of the lake were caused to flow over the same. The principle is well settled that if the volume or expanse of navigable waters be increased artificially, the public right is correspondingly increased.”
In Diversion Lake Club v. Heath (126 Tex. 129, 140, supra), the Supreme Court of Texas said: “ When the irrigation company, plaintiff in error’s predecessor in title, constructed the dam across the river, it caused by its voluntary act the flood waters of the river, public waters, to spread over the land which it had acquired, submerging and in effect destroying a portion of the river bed, and giving to the public-waters a new bed. This artificial change in the river and its bed did not affect the public nature of the waters and did not take away the right of the public to use them for fishing.”
In Bohn v. Albertson (107 Cal. App. 2d 738, 749, supra) where the waters of the San Joaquin Biver had broken a levee and flooded lands of the plaintiff, the California Court of Appeals in sustaining the right of the public to fish in such waters, said: “ The real question here is not of the title to the land but whether by the flooding, the right of navigation and fishing arose in the public. The solution of this question, in turn, depends upon whether the waters on the tract are navigable. * * * As the waters are navigable, then, although the title to the lands thereunder still remains in the owners and they have the right to reclaim, the public, until the land is reclaimed, has the right of navigation and fishery”.
In United States v. Pennsylvania Salt Mfg. Co. (30 F. 2d 332, 334, supra) the Court of Appeals for the Third Circuit held that, where the United States Government widened and *383 lengthened a slip between its pier and that of defendant by submerging its own land and a strip of land which it had acquired from the defendant, “it thereby subjected the same to public navigation
The rule of these cases appears to have been adopted by the American Law Institute in its Eestatement of the Law, Torts (vol. I, § 193) which contains the following unqualified statement: “A person is privileged to navigate in a reasonable manner navigable waters situated on land in the possession of another.” Further, in comment “b” to the section, the rule is laid down that ‘ ‘ the privilege of navigation is one which adheres in every navigable stream without dedication, condemnation or prescriptive user.”
The result reached in the majority of jurisdictions would seem to be correct in principle. A man who creates, or allows to continue, a condition whereby his land is submerged by navigable waters which the public may reach without trespassing on his upland, should be required to accept the public right of navigation as a legal concomitant of that condition. Stated otherwise, it seems only reasonable that he who would have an arm of the sea at his door should be prepared to accept the burdens of the sea, one of which is the right of the people to navigate in its waters.
The claim of trespass in these proceedings is predicated upon the boatmen’s use of the privately owned harbor bed for the purpose of anchoring. However, the law has long recognized that private rights in submerged land must yield to a reasonable exercise of the dominant right of navigation. In Scranton v. Wheeler (179 U. S. 141, 163), the Supreme Court said:
‘‘ Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation.”
This principle was applied by the Supreme Court in the Lewis Blue Point Oyster case (229 U. S. 82, 87, supra) to hold that where an oyster bed was destroyed by the Government in the course of deepening a channel in underwater lands, the oyster grower, who owned the lands, was not entitled to compensation, In so holding, the Supreme Court said: “ If the public *384 right of navigation is the dominant right and if, as must be the case, the title of the owner of the bed of navigable waters holds subject absolutely to the public right of navigation, this dominant right must include the right to use the bed of the water for every purpose which is in aid of navigation Therefore, when the owners of the lands in question, by opening them to the sound, conferred upon the public the right of navigation in the harbor, they thereby also conferred upon the public the incidents necessary to the enjoyment of that right. One of these incidents is the right of temporary anchorage. (Anderson v. Reames, 204 Ark. 216; Kuramoto v. Hamada, 30 Hawaii 841; cf. Hall v. Wantz, 336 Mich. 112; Paterson v. Dust, 190 Mich. 679; 1 Farnham on Waters and Water Rights, § 46.)
In view of the court’s conclusion that when the owners of the harbor area caused their lands to be submerged by navigable waters, the public right of navigation, including as an incident thereto the right to anchor, immediately extended to the area, it is unnecessary in these proceedings to decide whether, under the circumstances set forth above, the landowners must be considered to have dedicated the harbor permanently to the public use. (See, for example, DuPont v. Miller, 310 Ill. 140; Post v. Pearsall, 22 Wend. 425; Commonwealth Water Co. v. Brunner, 175 App. Div. 153.)
What has been said above is sufficient to warrant the dismissal of the charges of trespass based upon the action of the defendants in anchoring in the harbor. There remains to consider the specification against the defendant Scannella of trespass upon the adjoining beach below mean high-water level.
In the opinion of the court, the public right of navigation does not include the right to enter upon the foreshore when it is in private ownership, except when and to the extent necessary in the exercise of the right of navigation. The defendant Scannella does not contend that an emergency arose while he was in the harbor that required him to go ashore. In Smith v. Odell (234 N. Y. 267, 272), the Court of Appeals said that the “ easement of passage over navigable waters does not involve a surrender of other privileges which are capable of enjoyment without interference with the navigator”. (See Stewart v. Turney, 237 N. Y. 117.) The court having found that the foreshore is owned by Mr. Fairchild and his lessor and that the defendant Scannella made an unprivileged entry thereon, the court is constrained to find this defendant guilty of trespass as charged in this specification of the information laid against him,
*385 In conclusion, it may not be amiss to point out that, if use of the harbor by the boatman should require regulation,* appropriate authority for this purpose has been vested in the Trustees of the Village of Lloyd Harbor by subdivision 63 of section 89 of the Village Law. The powers of the village trustees in this respect were reserved, as authorized by statute,* in the action taken by them at their meeting on May 26, 1957, consenting to the extension to the shoreline of the village of the recently enacted ordinance of the Town of Huntington regulating the use of waterways within the town.
Although the authority of the village under subdivision 63 of section 89 of the Village Law expressly is made subject to the laws of the United States, the record here shows that on April 8, 1957, the Corps of Engineers of the United States Army, to whom Federal authority in the matter is delegated, declined to exercise jurisdiction in the area of the Lloyd Harbor Basin.
For the reasons stated above, I am of the opinion that the defendants are not guilty of the charges laid against them insofar as such charges are based upon their action in dropping anchor in Lloyd Point Basin. With respect to the specification of trespass on the beach by the defendant Scannella, I am of the opinion that he is guilty as charged.
The hearings in these proceedings will resume at the Police Booth, Village of Lloyd Harbor, at 10:00 a.m. on July 6, 1957. At that time the court will enter orders dismissing the complaints against defendants Kraemer, Foley and Emig, and will impose sentence on the defendant Scannella. In the meantime, the defendant Scannella remains paroled in the custody of his attorney. The other defendants may consider themselves discharged.

 The court may take judicial notice of publications of the United States Coast and Geodetic Survey. (See Boone v. Kingsbury, 206 Cal. 148; Colby v. Todd Packing Co., 80 F. Supp. 761; cf. Atkocus v. Terker, 30 N. Y, S, 2d 628.)

 The witness testified that the portion of the harbor south of the entrance “has never been used by the boatmen, by common consent, and the reason for that was the proximity of houses to the beach”. He conceded, however,_ that a sign had been posted at the entrance to the harbor bearing the legend: “No anchoring south of the entrance by Order of the Village of Lloyd Harbor Police ”,

 One apparent difficulty with this contention is that the Horse Neck patent by its terms included “all woods Beaches Marshes Meadows Pastures Creeks Waters Lakes Fishing Hawking Hunting & Fowling and all other Profits Commodities & Emoluments to the said Pareell or Tract or Land belonging annexed or appertaining.” The Queens Manor Grant contained like provisions. Apparently, however, the defendants would contend that, in determining the boundaries of property conveyed by a deed, reference should not be made to the language of the deed describing what is to pass as an appurtenance to the property conveyed. (See Lowndes v. Township of Huntington, 153 U. S. 1, 22.)

 Cf. Yachting, July, 1957, p. 87.

 L. 1957, ch. 158.