Charles C. MacLean, Jr., P. J.
The defendants, who are clam diggers by trade, are charged with having trespassed upon the posted and privately owned underwater lands of Sherman M. Fairchild located in Lloyd Point Basin (also known as “ Sand City”), within the incorporated village of Lloyd Harbor, in violation of section 1 of Ordinance 12 of the village. More particularly, the informations charge that on September 4,1957, the defendants, working in rowboats, dug and raked shellfish from the bottom of the bat in without the consent of the owner.
The defendants, who were not represented by counsel, declined to plead to the charges until they had explained their position. They freely admitted that on the date mentioned they entered the basin in rowboats and proceeded, by the use of rakes 30 feet in length, to dig for clams in the bottom of the basin and that they had each caught about a peck before the complainant, a guard employed by Mr. Fairchild, appeared and challenged their right to clam in the area.[1] They also admitted that they had *387 seen the sign posted at the entrance to the basin reading “Private Cove — No Trespassing — No Anchoring”.
In justification of their conduct, the defendants asserted, first, that every fall for the past 10 years or more, they and others have dug clams in the area without objection from anyone. Secondly, they said that they were familiar with the decision of this Court in People v. Kraemer (7 Misc 2d 373) holding that, notwithstanding the private character of the lands under the harbor, the public has a right of navigation in the area, including the right of temporary anchorage. They suggested that if, as a matter of law, the conduct of yacht owners in dropping anchor on the bottom of the harbor did not constitute trespass under the village ordinance, it should follow that their action in putting clam rakes into the bottom did not constitute such a trespass.[2] They said, however, that if in the opinion of the court the facts stated in the informations amounted to trespass, they desired to plead guilty. The court observed that the defendants apparently wished to test the sufficiency of the informations as a matter of law and explained that this could be done by a motion to arrest judgment made after entry of a plea of guilty. Each defendant adopted that course and the question here is the disposition to be made of the motions.
There can be no doubt that, if done without the consent of the owner, both the action of boatmen in dropping anchor on the underwater lands in the area and the action of the defendants in inserting their clam rakes into those lands would constitute trespass unless-such actions could be justified as an exercise of some legal right. In the Kraemer case, this court held that the action of boatmen in anchoring in the lands was justified as an incident to the exercise of the public’s dominant right of navigation. The defendants apparently believe that their conduct may be justified on the same basis. We think not.
In Smith v. Odell (234 N. Y. 267), the claim was made that the public, in the exercise of its right to navigate in Great South Bay, was entitled to shoot waterfowl in the area, notwithstanding that a colonial patent to the lands under the Bay had included an express grant of the privilege of hunting in the area. The Court of Appeals rejected this claim, saying (p. 272) that the “ easement of passage over navigable waters does not involve a surrender of other privileges which are capable of enjoyment without interference with the navigator ”. Since clamming *388 appears no more related to the management of a boat than duck hunting, it follows that defendants’ conduct cannot be justified as an exercise of the public right of navigation. But can their conduct be justified as an exercise of the public right of fishery?
At common law, the public ordinarily had the right to hunt and fish in waters subject to the public right of navigation. (See Knickerbocker Ice Co. v. Shultz, 116 N. Y. 382, 387; Slingerland v. International Contr. Co., 169 N. Y. 60, 72.) Such rights, however, were separate and distinct from the public right of navigation. This is shown by the fact that, although the King was powerless to alienate the public right of navigation by a grant of underwater lands, he had the right to make an express grant of an exclusive (or “several”) right of hunting and fishing in any area in which he conveyed the underwater lands, subject, however, to the superior public right to use such lands for all navigable purposes. These principles are established by a long line of cases involving colonial grants of parts of Long Island that included harbors and bays in the areas conveyed. (Rogers v. Jones, 1 Wend. 237; Trustees of Brookhaven v. Strong, 60 N. Y. 56; Smith v. Odell, 234 N. Y. 267, supra; cf. Roe v. Strong, 107 N. Y. 350; Town of Brookhaven v. Smith, 188 N. Y. 74; Lewis Blue Point Oyster Cultivation Co. v. Briggs, 198 N. Y. 287, affd. 229 U. S. 82; Oelsner v. Nassau Light Power Co., 134 App. Div. 281).[3]
No claim is made in these proceedings that the owners of the lands under the basin are entitled to the benefit of the grant of the exclusive right of fishery contained in the colonial patents to Lloyd Neck.[4] Absent such a claim, we would feel impelled to hold, if necessary to a decision of these motions, *389 that the public right of fishery, like the public right of navigation, followed the public waters when the landowners or their predecessors in title caused the area to be submerged thereby.[5] But the question remains whether the right to take shellfish placed by nature in privately owned land is vested in the public as part of the common right of fishery or is reserved to the owner of the underlying land.
The determination of this question must conform to the principle laid down by the Court of Appeals in Hedges v. West Shore R. R. Co. (150 N. Y. 150, 157) that, “ Where two such rights or interests exist, with respect to the same portion of the earth’s surface, each must be exercised and enjoyed in a reasonable way. Each right or interest in such a case is always subject to the qualification that it cannot be exercised or enjoyed in such a way as to destroy the other.” While the public character of the waters is not affected by the ownership of the underlying land, neither does privately owned land lose its character by the inflow of navigable waters, except to the extent that private rights must yield to dominant rights of the public.[6] The source of the public rights is the navigable water, and the underlying land is open to those activities of the public that are closely connected with the water. Thus, in Munninghoff v. Wisconsin Conservation Comm. (255 Wis. 252, 260) the Supreme Court of Wisconsin said that the public rights in navigable waters flowing over private lands include “ the incidental use of the bottom ” for the purposes of “ walking as a trout fisherman does in a navigable stream, boating, standing on the bottom while bathing, casting an anchor from a boat in fishing, propelling a duckboat by poling against the bottom, walking on the ice if the river is frozen, etc.”
*390 But when an activity is more closely identified with the underlying land, when it entails some physical disturbance of that land not directly connected with the enjoyment of the waters, the character of the activity as private or public should be determined by the ownership of the lands. We think, therefore, that in the case of clamming, because of the relative lack of mobility of the shellfish, their way of living in the land, and the ability of a landowner to retain more than nominal dominion and control over them, the activity is more closely related to ownership of the underlying land than to utilization of the public waters. For this reason, we would hold, if the case were one of first impression, that the defendants had no right to rake for the shellfish in the private lands.
The New York courts do not appear to have passed upon the point. In other States where the question has arisen the courts have reached conflicting results. In one State, at least, it appears established that a grantee of underwater lands conveyed by the State acquires an exclusive right to shellfish growing in such lands. (Sequim Bay Canning Co. v. Bugge, 49 Wash. 127; Wiegardt v. Brennan, 192 Wash. 529.)
In the Sequim Bay Canning Co. case, the Supreme Court of Washington said (p. 131): “ Clams ordinarily live in the soil under the waters, and not within the waters. It is true they derive a part of their sustenance from the sea during the times the waters overspread the lands; but at other times they live, not merely upon, but actually within the land. They, therefore, in a very material sense, belong with the land. When taken they must be wrenched from their beds, made well down in the soil itself. It must follow therefore that, if the state has authority to invent one with the private ownership of the tide lands, such investiture must carry with it the right to exercise dominion and ownership over what is upon the land, and especially over things so closely related to the soil as clams.”
The reasoning of the court is persuasive. We find, however, that there is a line of cases decided by the courts of England, Connecticut, Massachusetts and Maine holding that the public right of fishery includes the right to take shellfish located on lands that are privately owned. (Bagott v. Orr, 2 Bos. & P. 472; Peck v. Lockwood, 5 Day [Conn.] 22; Weston v. Sampson, 8 Cush. [Mass.] 347; Moulton v. Libbey, 37 Me. 472; see, also, Hume v. Rogue Riv. Packing Co., 51 Ore. 237.) None of these cases, however, contains a satisfactory explanation of the result *391 reached therein.[7] Whatever deference these cases might otherwise be entitled to receive, we consider that their authority has been seriously impaired by the case of McKee v. Gratz (260 U. S. 127). Although cited to the Supreme Court by counsel in that case, this line of cases is not mentioned by the court in its opinion holding that a good cause of action was stated by a complaint seeking to recover damages for the taking of mussels from the bed of a stream on the plaintiff’s farm in Missouri. In so holding, the court said, per Mr. Justice Holmes (p. 135): “ As to the plaintiff’s title, it is not necessary to say that the mussels were part of the realty within the meaning of the Missouri Statutes or in such sense as to make the plaintiff an absolute owner. It is enough that there is a plain distinction between such creatures and game birds or freely moving fish, that may shift to another jurisdiction without regard to the will of landowned or State. Such birds and fishes are not even in the possession of man. 252 U. S. 434 2 Kent, Comm. 349. Young v. Hichens, 6 Q. B. 606. On the other hand it seems not unreasonable to say that mussels having a practically fixed habitat and little ability to move are as truly in the possession of the owner of the land in which they are sunk as would be a prehistoric boat discovered under ground or unknown property at the bottom of a canal. Elwes v. Brigg Gas Co., 33 Ch. D. 562. Reg. v. Rowe, Bell, C. C. 93. Barker v. Bates, 13 Pick. 255.”
The court made it clear that the views thus expressed were of equal force whether the stream in which the mussels were found was navigable or nonavigable.[8] On this point the court said (p. 136): “ We say nothing about the character of the stream as to navigability. The jury at least might find that there was nothing in that to prevent the application of what we have said. We are slow to believe that there were public rights extending to the removal of mussels against the land owner’s will.”
*392 This decision, while not controlling in a case governed by the common law of New York, is entitled to great respect. We see no ground for distinguishing it here. The fresh-water mussels with which Mr. Justice Holmes was concerned may have a somewhat more fixed habitat than the principal commercial clams of the east coast, from the taking of which these defendants and many others derive a living. But the difference, if any, in mobility must be slight and, in any event, not significant enough to be important for present purposes.
Although clams are “ animal free ” in the sense that they are able to burrow in the sand or mud, their habits are of a distinctly sedentary nature. This was recognized in People v. Miller (235 App. Div. 226, 232, affd. without opinion 260 N. Y. 585) where, in another connection, the court accepted the argument that “ clams are not migratory; * * * and cannot be classified as force natures ”[9]. The court was referring to soft-shell clams, but it seems clear that the hard-shell variety (for which the defendants presumably were fishing) also has no significant ability to move. Otherwise, there would be no profit in the practice, common in this county and elsewhere, to obtain leases of underwater lands from the public authorities for the purpose of planting and cultivating hard-shell claims therein. (See Robins v. Ackerly, 91 N. Y. 98; Robins Is. Clam Co. v. Gaffga, 170 Misc. 362; Tiller, Hard-Clam Fishery of the Atlantic Coast, supra, pp. 4, 20.)
We think, therefore, that both sound principle and the weight of authority require that we hold that, whatever rights the public may have to catch freely moving fish in the waters of Lloyd Point Basin, the public does not have the right to rake for shellfish in the private lands under those waters. We may add that any implied license that the clam diggers previously may have enjoyed in the area, based upon the conduct of the owners in permitting clams to be caught therein, would appear to have been terminated when the owners posted the area as private property and forbade trespassing therein. (See McKee v. Gratz (260 U. S. 127,136, supra.)
*393 The hearings in these proceedings will resume at the police booth, village of Lloyd Harbor, at 6:30 p.m. on October 18,1957, at which time the court will enter orders denying the defendants’ motions to arrest judgment and will impose sentence on them. Until then, the defendants will remain paroled in their own custody.

 The technique involved in the use of bull rakes is described as follows in Tiller, Hard-Clam Fishery of the Atlantic Coast (U. S. Dept of Interior, Fish & Wildlife Service, Commercial Fisheries Rev., Oct., 1952, Vol. 14, No. 10, pp. 3-4) : “ Long sectional wooden handles or stales are fitted to the rake heads the length depending on the depth fished, and the strength and skill of the fishermen. Occasional reports were obtained of stales over 50 feet long, although 36 feet is usually the maximum length. In fishing, the rake is shoved out and away from the anchored boat, and then worked through the bottom in a series of short tugs to a vertical position, from which it is hauled up. The long curved teeth force a roll of bottom soil ahead of them as the rake is pulled, and the clams are held, while the soil is washed through.”

 The ordinance is set forth in full in the opinion in, the Kraemer case (supra, p. 375).

 These eases recognize repeatedly the principle expressed in People v. Vanderbilt (26 N. Y. 287) upon which we relied in the Kraemer ease, that the public right of navigation remained unaffected by crown grants of underwater lands. “ Whatever its [the town’s] rights acquired by the grant, they were and are, nevertheless, subject to the public rights of navigation * * * These rights have ever existed * * *. (Town of Brookhaven v. Smith, supra, pp. 78-79.) No reason has occurred to us why a 'landowner who has availed himself of the public waters to submerge his lands should be more free from the burdens of the public right than one whose title to underwater lands is derived from a grant made by the crown. (Cf. Fulton Light, Heat & Power Co. v. State of New York, 200 N. Y. 400, 418.)

 The provisions granting an exclusive right to fish and hunt in the area of the lands conveyed are quoted in a footnote to the opinion in the Kraemer ease (supra, p. 379). It seems probable that, under the eases cited in the text, the recipients of. the grants could have maintained successfully that they had an exclusive right to catch fish in the tidal stream that flowed through the area of the basin in colonial times. (Cf. supra, p. 376.)

 The question appears not to have been decided in New York. See Smith v. Odell (supra, pp. 271-272). (Cf. Slingerland v. International Contr. Co., supra.) In other States the courts have been divided on the question. Some have held that the public rights of hunting and fishing, as well as the public right of navigation, followed the public waters when they were made to submerge privately owned lands. (Diversion Lake Club v. Heath, 126 Tex. 1291; Bohn v. Albertson, 107 Cal. App. 2d 738; Diana Shooting Club v. Husting, 156 Wis. 261. Cf. Hume v. Rogue Riv. Packing Co., 51 Ore. 237.) Other courts, while recognizing that the public right of navigation extends to private lands when submerged, have held that the public rights of hunting and fishing do not follow the public waters into such areas. (Sterling v. Jackson, 69 Mich, 488; Schulte v. Warren, 218 Ill. 108.)

Matter of City of New York (Realty Associates) (256 N. Y. 217, 220) holding that private lands do not lose their character as such by avulsion, although the public right of navigation extends to “ waters covering earth which previously had been upland ”.

' Each case rests principally upon the authority of the earlier case or cases except, of course, the first one, Bagott v. Orr, decided by the English court. That case is not impressive as authority. It was decided, in a brief opinion, on a question of pleading. The court held (p. 479) that, in an action of trespass for taking shellfish, “if the plaintiff had it in his power to abridge the common law right of the subject to take sea-fish, he should have replied that matter specially ”.

 At common law, fish were classified as ferae naturae, with the result that the owner of a nonnavigable stream could not recover the value of fish taken from the stream by a trespasser; his only action was for the trespass to his Inntl. (Beach v. Morgan, 67 N. H. 529.)

 In the Miller ease, the Appellate Division ruled that clams growing in a land-loched bay held in private ownership were not subject to the provisions of the New York State Conservation Law relating to the taking of clams. Relying upon the observation of the court referred to in the text, the Attorney-General of the State has expressed the opinion that clams lying in privately owned lands under waters open to the sea are “ effectually within private proprietary control” and therefore not subject to the Conservation Law. (1934 Atty. Gen. 292, 294.) With respect to the protection of property interests in planted shellfish, see Fleet v. Hegeman (14 Wend. 42); Robins Is. Clam Co. v. Gaffga, infra', Penal Law, § 1425, subd. 8.