Leon D. Lazer, J.
Under attack in this action f or a judgment declaring its nullity is the Town of Islip (“ Islip ”) gill netting ordinance which regulates that “ Style ” of fishing by restricting it to specified times and locations and by providing for licensing. Plaintiff, a commercial fisherman, moves for a preliminary injunction alleging irreparable injury by virtue of the prohibition of such fishing from April 15' to June 1 when weakfish are found in the waters of the Great South Bay.
The town’s principal predicate of regulatory power is a special act of the Legislature enacted in 1857 (L. 1857, ch. 167). That statute authorized: ‘ ‘ the inhabitants of the town of Islip, in the county of Suffolk, at their annual town' meetings, to make such prudential rules and regulations for the planting and taking of oysters and the time and manner of using the fisheries in the Great South bay, within the limits of said town, as may from time to time be deemed expedient to encourage the increase and prevent the destruction of the fisheries in said town.”
The 1857 act also made the taking of shellfish by nonresidents an offense punishable by a fine, the proceeds of which were to be used for the benefit of the poor. The act was amended in 1866 and 1874 to provide for planting and protection of oysters (L. 1866, ch. 306; L. 1874, ch. 549, see L. 1911, ch. 647) and the 1874 amendment was itself amended by chapter 142 of the Laws of 1878 which provided for joint control -of the Great South Bay oyster fisheries by Islip and its neighbor, the Town of Babylon. There is no indication that the 1857 act was ever specifically repealed or that any regulations relating to migratory fish were ever created under it although the town asserts that such ordinances had previously been adopted by the town, one as early as 1765 and in 1855. The town also claims regulatory authority by virtue of its ownership of the land under the waters of the Great South Bay.
■Plaintiff contends that the 1857 statute was intended to apply solely to shellfish, that subsequent legislation contained provisions which repealed it and that the field of protection of migratory marine fish has been pre-empted by the State.
The legislative power to regulate fishing in public waters has been exercised from the earliest period of common law and it has become a settled principle of public law that power resides in the several States to regulate and control the right of fishing in public waters within their respective jurisdictions (Lawton v. Steele, 119 N. Y. 226). Migratory marine fish are ferae naturae (see McKee v. Gratz, 260 U. S. 127; People v. Johnson, *368 7 Misc 2d 385) and are the property of the State (People v. Miller, 235 App. Div. 226, affd. 260 N. Y. 585). The State cannot make an. exclusive grant to a private person of such fish (Slingerland v. International Contr. Co., 169 N. Y. 60) and the taking of them remains subject to State regulation even where found in private waters (Rockefeller v. Lamora, 85 App. Div. 254). Fishing in navigable waters or in “ arms of the sea is presumptively common to the public” (Slingerland v. International Contr. Co., supra, p. 72; People ex rel. Howell v. Jessup, 160 N. Y. 249). Without a specific delegation of power a town has no authority to restrict by ordinance the catching of migratory fish in navigable waters within its jurisdiction (36A C. J. S., Fish, § 26).
The right of towns to regulate the cultivation and taking of shellfish, on the other hand, has historically been based upon proprietary criteria (see Bevelander v. Town of Islip, 17 Misc 2d 819). Such fishing does not interfere with the public right of navigation (Trustees of Brookhaven v. Strong, 60 N. Y. 56; Bevelander v. Town of Islip, supra; People v. Johnson, 7 Misc 2d 385) supra) or the common right of the public to fishery (Vroom v. Tilly, 184 N. Y. 168). Towns which own the underwater lands within their borders have been delegated regulatory power over taking of shellfish (see Town Law, § 130, subd. 18) and Islip, by letter patent granted in 1930 (L. 1930, ch. 535), received both the ownership of the land within its boundaries under the Great South Bay and specific delegation of regulatory authority over shellfisheries. Nevertheless, plaintiff’s contention that the 1857 special act delegated authority solely over the taking of shellfish would require a strained construction of the act. The term “ fishery ” means a “ place for catching fish” (Webster’s Third New International Dictionary) and a court should not limit the plain language of a statute (Cahen v. Boyland, 1 N Y 2d 8). It is not a restrictive interpretation of the 1857 law which defeats it — rather it is the inescapable conclusion, reached after a review of legislative history, that subsequent State legislation has swept the statute away.
A decade after the enactment of the 1857 special act the State moved to “ consolidate the several acts relating to the preservation of moose, wild deer, birds and fresh water fish” (L. 1867, ch. 898). This consolidated act contained provisions capable of State-wide application as well as sections relating to specified geographic areas and it established a model which was followed in all subsequent legislation. Further consolidation was affected in 1868 (L. 1868, ch. 785) and in 1871 (L. *369 1871, ch. 721) when provisions for regulation of saltwater fish were incorporated: e.g., the use of “purse nets” was outlawed in Suffolk County waters except in Long Island Sound, Garner’s Bay and Little Peconie Bay and regulations relating to gill nets used in, inter aUa, Long Island Sound were specified. The 1871 statute authorized county boards of supervisors to make regulations for the protection of fish other than those mentioned in the statute, and empowered towns to elect constables to enforce the act. Revisions enacted in 1879- (L. 1879, ch. 534) contained a general clause repealing all inconsistent acts and parts of acts except, inter alia, those relating to the preservation of shellfish and those conferring regulatory powers on county boards of supervisors.
In 1890' the Legislature established a commission to revise and codify “ the laws for the protection and preservation of fish and shellfish and of birds and quadrupedes ” (L. 1890, ch. 99) and in 1892 the codification, specifically designated a general law and entitled the Game Law, was adopted (L. 1892, ch. 488). Although the 1892 Game Law contained an article regulating shellfisheries in Great South Bay, it singled out the Suffolk County Board of Supervisors as the only such body permitted to adopt ordinances contrary to State law and repealed all inconsistent ordinances adopted by other boards.
The Forest, Fish and Game Law enacted in 1908 (L. 1908, ch. 130) established a Bureau of Marine Fisheries and defined marine fisheries to include all salt water fisheries, shellfisheries and fisheries within tidal waters of the State. Once again authority to regulate the taking of fish and shellfish was granted to the Suffolk County Board of Supervisors. This statute also contained a general repealer relating to inconsistent acts.
The Conservation Law, adopted in 1911 (L. 1911, ch. 647), established a Department of Conservation empowered to administer all laws relating to fish and game and once again the act contained a section which repealed all prior inconsistent general, special or local laws.
The Conservation Law was amended in 1912 (L. 1912, ch. 318) when a new fish and game article was adopted. The Conservation Department’s responsibilities were redrafted to provide, inter alia, for regulation of the taking of food and game fish, and the Boards of Supervisors of Nassau and Suffolk were authorized to adopt laws not inconsistent with State law regulating the taking of fish and shellfish from “ arms of the sea.” A recodification of the Conservation Law “in relation to marine fisheries ” was adopted in 1942 (L. 1942, ch. 105). The 1955 *370 amendments to the Conservation Law (L. 1955, ch. 630) finally stripped county boards of supervisors of all powers vested in them by any other law to provide for the protection of fish and game, leaving such boards only the power to appoint members to a district fish and wildlife board (Conservation Law, § 198) and to submit programs for the control of rabies (Conservation. Law, § 204). The 1955 act asserted State ownership of all fish, game, wildlife, shellfish, crustácea and protected insects (Conservation Law, § 151) and it provided that none of these could be taken except as provided in the act (Conservation Law, § 152, subd. 1). Among the fish for which special protection was provided were weakfish (Conservation Law, § 319, subd. 1).
The Environmental Conservation Law of 1972 (L. 1972, ch. 664) contains many of the provisions found in its predecessors. Of special significance to the determination of the instant issues is the provision relating to nets and licenses which is derived from the 1942 act: ‘ ‘ A citizen resident of the state * # * may without license take food fi.sh.in the marine district * * * (b) with nets other than beam trawls, and otter trawls.” (ECL 13-0335.)
The marine district is defined as the ‘ ‘ waters of the Atlantic Ocean within three nautical miles from the coast line and all other tidal waters within the state ” (ECL 13-0103). Since the waters of G-reat South Bay are clearly within the marine district it is not possible to reconcile the 1857 special statute insofar as it grants authority to the town to regulate the taking of migratory fish with the Environmental Conservation Law.
Even this cursory overview of the evolution of State regulation demonstrates that the 1857 act has not survived the ever increasing efforts of the Legislature to adopt a comprehensive State code of fish and wildlife protection. If the act is construed to have escaped the general repealers found in the acts of 1879, 1908 and the 1911 Conservation Law, it still must be considered to have been repealed by implication by virtue of the general legislation which followed it. That the Environmental Conservation Law and its forebears constitute general law is scarcely to be doubted. Although the (fish and game law has throughout its history provided regulations relating to specific geographic areas as well as general regulations, it has, at least since the 1892 codification, been designated a general statute. Title, form or phraseology are not, of course, the sole criteria which distinguish general statutes; substance and operation must be considered (Matter of Henneberger, 155 N. Y. 420). If a statute relates to persons, entities or things as a class it is a general *371 law (People ex rel. Cent. Trust Co. of N. Y. v. Prendergast, 202 N. Y. 188). The Environmental Conservation Law (including articles 11 and 13 which comprise the current fish and game law) expresses State-wide policy (ECL 1-0101, subd. 1), asserts State ownership of all fish and game in the State not in private possession (ECL 11-0105) and continues to regulate fishing in a marine district which includes all tidal waters in the State and the waters of the Atlantic within three nautical miles off the coast. In substance and application it is a general law. The 1857 act, on the other hand, is a special or local law because it is limited in its operation to a specifically named town (Schuyler v. South Mall Constructors, 32 A D 2d 454).
The general rule that a special statute is not repealed by a subsequent general act (People ex rel. Leary v. Knox, 166 N. Y. 444) does not apply when the two are so inconsistent they cannot stand together and legislative intent to repeal is manifest (People v. Mann, 31 N Y 2d 253; Cimo v. New York, 306 N. Y. 143; People v. Plunkett, 295 N. Y. 180; Peterson v. Martino, 210 N. Y. 412; Seligman v. Wickham, 33 A D 2d 840, affd. 27 N Y 2d 993). Thus a general statute will repeal special or local acts by implication where they are inconsistent with it and where it can be seen from the whole enactment that the Legislature intended to sweep away all local peculiarities and to establish a uniform system (People ex rel. Fleming v. Dalton, 158 N. Y. 175; Crawford v. City of Newburgh, 231 App. Div. 613). The Environmental Conservation Law represents the current culmination of a long-standing legislative effort to establish a sound system of State-wide control and protection of State fish and wildlife resources. The 1857 special act cannot be deemed a unique local exception to this State-wide code.
The town’s final argument is its weakest. It asserts that its power to regulate shellfisheries authorizes the gill netting ordinance because that type of fishing interferes with the shell-fisheries. The fact that gill netting may interfere with shell-fisheries in a limited area is not a warrant for an ordinance which contains restrictions on the season for fishing, the size of nets and their markings, provides for licensing and which appears to have no direct relationship to shellfish areas.
Islip’s remedy lies in section 11-0311 of the Environmental Conservation Law, for under that section any 10 of its citizens may appeal to the Department of Environmental Conservation for protection of the spawning grounds the gill netting ordinance was intended to safeguard.
The motion is granted.